## Moses v. Boston & Maine Railroad.

The liability of railroad corporations, as common carriers, for goods transported upon their railroads, continues until the goods are ready to be delivered at their place of destination, and the owner or consignee has had reasonable opportunity, during the hours when such goods are usually delivered from their freight house, of examining them so far as to judge from their outward appearance whether they are in proper condition, and to take them away. Such reasonable opportunity is not, however, to have reference to the peculiar situation and circumstances of the consignee, but is to be such as would give to a person residing in the vicinity of the place of delivery, and informed of the usual course of business on the part of the servants of the company, in unlading the cars and delivering out goods of that character, and also informed of the time when the goods may be expected to arrive, suitable opportunity within the usual business hours for delivering such goods, after they have been placed in readiness for such delivery, to come to the place of delivery, inspect the goods and take them away.

Ten bags of wool, delivered by the plaintiff to the defendants at Exeter, in this State, to be transported to Boston, and there delivered to a consignee, were carried over the defendants' railroad in a train of cars which arrived at their freight house in Boston between one and three o'clock, in the afternoon. In the usual course of business, from two to three hours were required to unload the freight from the cars into the warehouse, and the gates were closed at five o'clock, so that no goods could be removed from the warehouse after that hour until the next morning. During the night the warehouse and most of its contents, including the wool, were consumed by fire.—*Held*, that upon these facts the jury were warranted in finding that the consignee had not a reasonable opportunity to take the wool into his possession before the fire, and that the defendants were liable as common carriers therefor, notwithstanding it might be proved by them that before the fire the wool had been placed upon the platform in the warehouse, from which such goods were usually delivered, separate from other goods, and ready for delivery.

The common law liability of common carriers cannot be limited by a mere notice brought home to the knowledge of the owners of the goods.

CASE, to recover the value of ten bags of wool lost.

The declaration originally contained but one count, in which it is alleged that the defendants, on the 2d of November, 1850, being common carriers of goods for hire, in consideration that the plaintiff, at the request of the defendants, delivered to them the wool in question, promised to take care of, safely convey from Exeter to Boston, and deliver to the plaintiff said wool for a reasonable reward, within a reasonable time; yet the defendants,

having accepted the wool for that purpose, did not carry the same to Boston, and did not deliver the same to the plaintiff, though a reasonable time therefor hath elapsed; and though afterwards, to wit, on the 9th of November, 1850, requested thereto; but so negligently conducted themselves with regard to the wool, that, through the carelessness and negligence of the defendants, it was lost.

The plaintiff had leave to amend the declaration, and filed four additional counts, which were allowed, saving to the defendants all exceptions on account of the amendment.

The first amended count does not allege that the defendants were common carriers, but sets out the undertaking of the defendants to carry the wool safely to Boston, and there keep it securely for a reasonable time after its arrival, and then to deliver it to the plaintiff on request; and a failure to fulfil the undertaking, alleging the negligence of the defendants, and the consequent loss, as in the original count.

The second amended count is in all respects similar to the original, except that it sets forth the undertaking of the defendants, and their failure to fulfil, as in the first amended count.

The third amended count is in all respects like the first, except that it sets out that the wool was to be delivered to T. B. Townsend & Son, instead of the plaintiff; and the fourth is in all respects like the third, except that it alleges that the defendants were common carriers, and kept a warehouse in Boston for storing goods conveyed upon their railroad, and that the wool after its arrival in Boston was to be kept therein for a reasonable time, and then delivered to Townsend & Son, on request.

It was proved on the trial that the wool was delivered to the defendants at Exeter, on the 2d of November, 1850, in bags, directed to Townsend & Son, Boston; that on the 4th it was carried over the defendants' railroad in their freight cars, arriving at the freight depot of the defendants in Boston at some time from about one to three o'clock in the afternoon; that, in the usual course of business, from two to three hours were required to unload the freight from the cars into the depot or warehouse,

Moses v. Boston & Maine Railroad.

and that the gates were shut at five o'clock, so that no goods could be removed therefrom after that hour until the next morning. It was also proved that on the night of the 4th the warehouse and most of its contents were consumed by fire, and the evidence introduced by the defendants tended to show that the wool was destroyed by the fire.

It was contended by the defendants that the wool had been removed from the cars and placed upon the platform of the warehouse, separate from other goods, and ready to be taken away by Townsend & Son, or the plaintiff, previous to the fire, and that these facts, in connection with a printed notice, offered in evidence by the defendants in order to restrict their carrier liability, which they had made public, and which they claimed had been brought home to the knowledge of the plaintiff, exonerated them from their liability as common carriers. The notice was as follows:

"Articles of freight must be taken away within twenty-four hours after being unladen from the cars, on arriving at their place of destination — the company reserving the right, if they see fit, of charging storage after that lapse of time. The company will not hold themselves responsible as common carriers for goods, after their arrival at their place of destination and unloading in the company's warehouse or depot."

The plaintiff contended that the wool had not been thus unladen and placed upon the platform previous to the fire, and that he had no knowledge of the printed notice previous to the wool being sent over the road. He also contended that if these facts were not so, nevertheless, the responsibility of the defendants as common carriers did not terminate until such a time had elapsed after the wool was taken from the cars and placed in the warehouse, as would enable Townsend & Son, with the exercise of reasonable diligence, to take it away.

The plaintiff also claimed that if the defendants' liability as common carriers had terminated previous to the fire, the wool was in their custody as warehouse-men, and was lost through their want of ordinary care and prudence, and that they were liable for it on that ground.

It was also made a question by the plaintiff, whether the defendants had not sold a portion of the wool and received a certain sum therefor.

By consent of the parties the jury were directed to return answers to five questions submitted to them in writing; it being understood that, upon the determination of such of these questions as might be material, a general verdict was to be entered in accordance with the finding of the jury upon those questions, subject to the opinion of this court. The questions were as follows:

1. Was the wool carried over the road and then removed from the cars to the platform of the freight depot in Boston, and separated from other goods before the fire?

2. Was it so carried and removed from the cars a sufficient time before the fire to enable Townsend & Son to obtain possession of it by the exercise of reasonable diligence on the part of the plaintiff and of Townsend & Son?

3. Did the wool fail of being delivered to Townsend & Son by reason of the want of ordinary care and prudence on the part of the defendants?

4. Was any portion of the wool sold by the defendants?

5. Did the plaintiff have any knowledge of the printed notice before the wool was sent over the road?

The plaintiff's counsel in his argument to the jury called their attention to the first paragraph in the printed notice, as an admission by the defendants that twenty-four hours was not an unreasonable time for the removal of the wool; and the court instructed the jury that it was competent evidence upon the second question, even if the plaintiff had no knowledge of the existence of this paper when the wool was sent. After the verdict was returned, and not before, the defendants excepted that these instructions were given without instructing the jury further, that if they treated the first paragraph in the notice as an admission, they were also to consider with it the succeeding paragraph.

The jury disagreed upon the first question, returned an answer in the negative to the second, in the affirmative to the third,

and in the negative to the fourth and fifth, and a general verdict was thereupon entered for the plaintiff, which the defendants moved to set aside.

Various questions are raised by the case upon exceptions taken to the rulings of the court upon evidence, and their instructions to the jury upon the third question; which, however, are unnecessary to be stated, as the case is decided upon other grounds.

*Wells & Bacon*, for the defendants.

The amended counts are not admissible, being for other and new causes of action, and founded upon different and independent contracts. *Bishop* v. *Baker*, 19 Pick. 517; *Duncan* v. *Sylvester*, 13 Maine 417; *Lombard* v. *Fowler*, 25 Maine 308; *Eaton* v. *Ogin*, 2 Maine 46.

In *Pierce* v. *Woods*, 3 Foster 530, *Eastman*, J., states the rule to be that the amendment must be consistent with the original declaration, and for the same cause of action; and in *Stephenson* v. *Mudgett*, 10 N. H. 341, *Parker*, J., says amendments are allowed only to cure an imperfect or erroneous statement of the subject matter upon which the action was in fact founded.

The defendants were common carriers only, and were sued as such, and by law were not liable for the goods after they were unloaded at the Boston depot. *Norway Plains Co.* v. *B. & M. Railroad*, 1 Gray 263; a case which grew out of the fire in question in this action. *Thomas* v. *B. & Pro. R. R.*, 10 Met. 477, the principles of which are adopted in 7 Foster 93.

The use made of the notice requiring goods to be removed from the depot within twenty-four hours, and extending the common carrier liability for that period, was illegal. By the law, when the goods were landed the defendants' liability ceased, and the manifest object of the notice was to compel people to remove their goods from the depot within twenty-four hours, or subject themselves to a charge for storage; and yet the court and the plaintiff's counsel both perverted the notice, and urged it upon the jury as an admission of the defendants that their

liability as carriers extended twenty-four hours from the time of unloading.

*H. F. French,* for the plaintiff.

The jury have found that the goods were not removed from the cars a sufficient time before the fire to enable the consignees to obtain possession of them by reasonable diligence. We contend that till this occurs the defendants remain liable as common carriers. If we are correct in this, we are entitled to judgment without regard to the question of negligence. If the goods were in the defendants' hands as common carriers, then the conclusive presumption of the law is, that they were lost by their negligence, unless the exceptions to the rule appear, to wit., that they were lost by the providence of God, &c.

The question when the liability of a railroad as a common carrier ceases, is new in this State.

In Massachusetts it was decided in the case, *Norway Plains Co.* v. *B. & M. Railroad,* that such liability ceases when the goods are discharged from the cars on the platform at the place of destination. We contend that the true rule is, that the liability continues until the consignee, by reasonable diligence, may obtain them. The true rule is to be deduced from the established principles of the common law. As Ch. Jus. *Shaw* well remarks, " although steamboats and railroads are but of yesterday, yet the principle which governs the rights and duties of carriers of passengers, and those which regulate the rights and duties of carriers of goods, and of the owners of goods carried, have a deep and established foundation in the common law."

What, then, is the rule fairly to be deduced from the common law ? With great deference to the opinion of the distinguished judge of one of the most learned courts in New-England, we cannot help feeling that his views on this point are modified by a desire to establish a convenient rule for the corporation. The learned judge says that a different view " would greatly mar the simplicity and efficacy of the rule that delivery from the cars into the depot terminates the transit." The question seems

rather to be what is the rule, than what would mar the simplicity of a rule which we assume to exist. Common carriers by wagons and the like, are bound to deliver goods to the consignee, and remain liable till such delivery. But it is said this is impracticable in the case of railroads. Ships, on the other hand, it is said, finish their duty when they deliver goods at the wharf; and, as if there could be no other intermediate mode of terminating the liability of railroads as carriers, the Massachusetts court elect to place them on the same footing as ships. We think a rule more simple and more just; more in accordance with common law principles, may be found than either. Why were common carriers ever held to insure the safe delivery of goods ? The answer to this question will indicate the true rule applicable to this new class of common carriers. " The rule," says Ch. *Kent*, " is intended as a guard against fraud and collusion." 2 Kent's Com. 579, 2d Ed. " The law presumes against the public carrier," &c. " If it were not for such a rule the carrier might contrive, by means not to be detected, to be robbed of his goods, in order to share the spoils." Ib. 603. But the rule as to carriers by water has not been adopted by the Massachusetts court. There must be something equivalent to a delivery, even by carriers by water.

In *Ostrander* v. *Brown*, 15 Johns. 39, it was held in New-York that placing goods on the wharf, without notice to the consignee, is not a delivery so as to discharge the carrier, even though there was a usage to deliver goods in that manner. Cited with approbation in 2 Kent 605. And the same distinguished jurist, 3 Com. 215, states the rule thus : " The general rule is that delivery at the wharf (where there are no special directions to the contrary) discharges the master." " But the very reasonable qualification of the rule is, that there must be a delivery at the wharf to some person authorized to receive the goods, or due previous notice must have been given to the consignee of the time and place of delivery ; and the master cannot discharge himself by leaving them naked and exposed at the wharf. His responsibility will continue until there is actual de-

Moses *v*. Boston & Maine Railroad.

livery, or some act which is equivalent, or a substitute for it, unless the owner of the goods, or his agent, had previously assumed the charge of the goods, or at least until the consignee has had notice of the time and place of delivery, and the goods have been duly separated and designated for his use."

Now, in analogy with this rule, and according to the reason on which the liability of carriers is founded, can a railroad company be held discharged without actual delivery ; without notice of the arrival — which is assumed by Ch. J. *Shaw* to be necessarily irregular as to freight trains — and without the possibility that the consignee by any diligence can obtain his goods ?  If the rule as to wagoners be hard, why not modify it according to the rule applied to water carriers ?  What reason for the rule has ceased to exist ?  Are corporations more honest than individuals ?  Are their servants and agents beyond the suspicion of fraud and corruption ?  May they not plunder the goods at the depot in the night as well as in the cars in the day ?  Are they more secure from other thieves and other injury, thrown out upon the platform at midnight, in rain and tempest, than in a car on the passage ?  It would seem that the whole reasons of the original rule were perverted and reversed, if it is to be held that railroads are carriers and insurers of the goods while locked up in their cars, and are to be free from liability when the goods are exposed on the platform to every danger.  In this very case, such is the difficulty of tracing the goods after they were delivered to the railroad, that the jury were unable to agree whether they were removed from the cars, and set apart or not, and the first question was not answered.

The instructions of the court as to the published rule of the defendants, that freight must be taken away within twenty-four hours, were correct, though immaterial as the case stands.   The printed paper containing this regulation was offered in evidence by the *defendants* to restrict their liability as common carriers. Of course whatever other rule, material to the case, was contained in the paper was open to the plaintiff to argue, and was competent evidence.

We contended that we had not a reasonable time and opportunity to remove the goods. What is a reasonable time must be a mixed question of law and fact, and the opinion and undertaking of the company, we think, as indicated by its printed regulations, was competent evidence. We might well contend that by this regulation the company had extended its liability to twenty-four hours beyond the arrival, if it were not so great without it. The company reserve the right " to charge storage *after the lapse of that time.*" This is surely a distinct negation of any right to payment for storage during the twenty-four hours. What does it mean except that the company will be liable in its first capacity until twenty-four hours after arrival, and then will assume another capacity of warehouse-men? They are first common carriers; afterwards, after twenty-four hours from the arrival of the goods, warehouse-men for hire. Is there an intermediate state — a sort of purgatory — where they are neither one nor the other, during which the owner cannot have his goods, and the company have full and exclusive control of them, with no liability? How many contracts does the owner make with the company when he silently delivers goods to its agents? Into how many shapes does the Proteus-like monster resolve itself? It is now a common carrier, again a warehouse-man, and then it claims a third indescribable shape between the two — neither frog nor tadpole — but a sort of creature without neither body nor soul, and, above all, with *no liabilities.* I think there can be no such transition state, and that under this printed regulation the defendant is a common carrier till twenty-four hours after the transit ends, and then is a warehouse-man.

But if it be an open question, what is a reasonable time, the company's own opinion, as published, may well be considered by the jury under the instructions of the court.

But the exception here was not that this was not evidence, but that if the jury so regarded it they should have been instructed to regard the other rule of the company, embraced in the second paragraph of the printed notice. The exception was taken after verdict, when it was too late to be taken.

As to the amendment, it is immaterial, if the defendants are liable as common carriers. If not, the new counts come strictly within the rule as to amendments. They are consistent with the original count, subject to the same plea, and such that they might originally have been joined with it. They are for the same cause of action, and introduce no new or additional demand. *Goddard* v. *Perkins*, 9 N. H. 490. The distinction between the original and amended counts is, that in one of the latter the defendants are not in terms described as common carriers, and in another the promise is alleged to be to deliver to Townsend & Son instead of the plaintiff, as alleged in the original. These variations are scarcely more than matters of form; but amendments in substance may be made to any extent not changing the cause of action. The substance of each count is the same, that the defendants took the goods, promised to take care of them, and deliver them in Boston, and failed to do so. The variation in the counts was designed to meet the plurality of forms and legal existences into which the defendants by turn transform themselves, under the same implied contract with the plaintiff; at one time common carriers, then for twenty-four hours not quite common carriers, nor yet warehouse-men, and finally warehousemen to all intents. The second count alone omits to describe the defendants as common carriers, in express terms, and that sets forth the liability in general terms to meet the views of the court, whatever the liability might be. It is perfectly consistent with the other count, does not describe the defendants in any capacity, but simply alleges the contract according to its terms, without attempting to characterize it according to its legal effect, but leaving the court to say as to that point.

SAWYER, J.* The first of the five questions submitted to the jury was thus submitted as involving the point on which the question turned as to the liability of the defendants, as common carriers, if it should be settled by this court to be the law that their

* PERLEY, C. J., did not sit.

Moses *v.* Boston & Maine Railroad.

liability as carriers terminated when the wool was taken from the cars and placed upon the platform of the warehouse at its place of destination, separate from other goods, and ready for delivery. This question was immaterial, if that liability in point of law rests upon other grounds ; and the general verdict would, in that view, be unaffected by an agreement of the jury, one way or the other, or by their failing to agree either way upon it. By the finding upon the second question the fact is established, under the instructions which were given upon that question, that Townsend & Son, the consignees, had not reasonable opportunity, after the wool was unloaded and before the fire, to remove it from the warehouse, with the exercise of reasonable diligence on their part and on the part of the plaintiff. The finding upon the fifth question is material only upon the view that the defendants may limit their carrier liability, as to such goods, by a public notice to that effect, brought home to the knowledge of the plaintiff. That upon the third question is material only in case it should become necessary to consider whether the defendants are to be held liable as warehouse-men on the ground of negligence, they not being liable as common carriers ; and that upon the fourth question being in favor of the defendants, is immaterial upon either of the points to be considered in the case.

If the verdict is to be sustained, it is clear that it must be upon one or the other of the grounds,—1st, that the jury, having found the fact in answer to the second question, that the wool was not removed from the cars a sufficient time before the fire to enable the consignees to remove it with reasonable diligence on their part and on the part of the plaintiff, it continued down to the time of its loss in the hands of the defendants as common carriers ; their liability, as such carriers, being held in law not to have terminated until the consignees had that reasonable opportunity after it was taken from the cars; or, second, that the jury, having found in answer to the third question the other fact, that the wool was lost through the negligence of the defendants, they are liable for the consequences of that negligence in the loss of the wool, in whatever capacity they held

it, whether as carriers, as depositaries, or as warehouse-men. There are two aspects, then, in which the case is to be viewed; one presenting the case of a suit against the defendants as common carriers, liable for all losses which may happen except such as arise from the act of God or the public enemy, and in which the question of negligence is not involved; the other against them as warehouse-men, depositaries, or bailees for hire, and in which they are to be held liable only for negligence.

Considering the suit, then, as one proceeding against the defendants as common carriers, it stands upon the original count in the declaration and the second and fourth amended counts. In these different counts the delivery and the receipt of the wool, the undertaking to carry to Boston and there deliver, and the nondelivery and loss, are alleged in substantially the same manner, except that in the amended counts the allegation is inserted, not contained in the original, that the defendants also undertook to keep the wool safely in Boston a reasonable time after its arrival, and then deliver on request ; and in the fourth the allegation is inserted, not contained in either of the others, that the defendants kept a warehouse in Boston for storing goods conveyed upon their railroad, in which they undertook to keep the wool for that reasonable time after its arrival, and then to deliver to Townsend & Co. instead of the plaintiff, as stated in the others.

That the amendments to this extent are admissible admits of no doubt. They all proceed against the defendants in the same character—as common carriers—to recover the value of the same ten bags of wool lost, with such modifications of the contract alleged, under which they were received by the defendants, as would seem to be necessary to adapt the declaration to the proof. The amended counts are clearly for the same cause of action as the original, and in no way inconsistent with it. The objection taken by the defendants to the amended counts, that they are for a different cause of action from that set out in the original, or are inconsistent with it, cannot be sustained, so far as it applies to the second and fourth amended counts. The views entertained by the court upon other points in the case render it

necessary to determine only upon this point that the second and fourth amended counts are admissible, while the others may be considered as inadmissible.

The defendants also excepted, after the verdict was returned, to the omission by the court in their instructions to the jury to charge that they were to consider the last paragraph in the printed notice in connection with the first. The exception stated in the case is, that in giving the instructions in relation to the first paragraph the court did not also instruct the jury that if they considered the first as an admission by the defendants, they were also to take into consideration with it the other paragraph. We do not understand the exception to be to the character of the instructions given, but to the fact that those being given in relation to the first clause in the notice, they were not followed by others in relation to the second. That the court did not give instructions upon a particular point, is no ground of exception to the verdict, unless the party excepting requested the judge so to instruct. It is to be understood that no such request was submitted, unless the case states otherwise. The exception must, therefore, be overruled.

The position taken at the trial that the defendants had limited their liability as common carriers to the time when the wool was taken into the depot, by a public notice to that effect, would not have availed the defendants if the finding of the jury upon the fifth question had established the fact that the notice was brought to the knowledge of the plaintiff before the wool was sent. In the case of *Moses* v. *Railroad,* 4 Foster 71, it was expressly decided that a public notice to the effect that the railroad company would not be responsible for loss or injury to goods in their hands as carriers, except such as might arise from negligence, would not have the effect thus to limit their common law liability, even when brought home to the knowledge of the owner. This renders it unnecessary to consider any question arising upon the character of the instructions given upon the fifth question ; and the only remaining point in the case, considered as an action against the defendants as carriers, upon the original count

Moses *v.* Boston & Maine Railroad.

and the second and fourth amended counts, is that involved in the second question, raising the principal inquiry in the case, when does the liability of a railroad company, as carriers of goods, terminate?

The wool in this case was received and conveyed by the defendants in their ordinary employment as common carriers. It was not of a value disproportionate to its bulk, and was such that no deception could have been practiced upon them as to the extent of the risk they incurred. In the transportation of such commodities, their responsibility as carriers commences with the receipt of the goods, though not put by them immediately on the transit, and it ceases only when they have reached their destination and their control over them as carriers has terminated. That control must continue until delivery, or a tender or offer to deliver, or some other act which the law can regard as equivalent to a delivery. The delivery of goods conveyed by railroad is necessarily confined to certain points on the line of the railroad track. Railroad companies cannot, like wagoners, pass from warehouse to warehouse, and there discharge their freight to the various consignees upon their own premises. They consequently establish certain points as places of delivery, and there unlade their cars of such of the freight as may most conveniently find its ultimate destination from those respective points. But while it is in the process of unloading, and afterwards, while awaiting removal, it must be protected from the weather and from depredation. Freight is brought over the road at all hours by night as well as by day, and the trains must necessarily be more or less irregular in the hours of their arrival. It cannot be required of the consignee to attend at the precise moment when his goods arrive, to receive and take care of them, and the company cannot discharge themselves from responsibility by leaving them in an exposed condition in the open air. Until the goods have passed out of their custody and control into the hands of the proper person to receive them, they have a duty to perform in the preservation and protection of the property, even after their responsibility as common carriers is at an end. *Smith v. Railroad*, 7 Foster 86.

Moses v. Boston & Maine Railroad.

It thus becomes a matter of necessity for them to provide de-
pots, or warehouses, for the reception of freight at the stations
established for its delivery. If the owner or consignee, or other
person authorized to receive the goods, is present at the time of
the arrival, and has opportunity to see that they have arrived,
and to take them away, this may be regarded as equivalent to a
delivery. They must be understood, after this, to remain in the
charge of the company, for his convenience, as depositaries or
bailees for hire. In such case the grounds upon which the com-
mon law liability of the carrier is made to rest have so far
ceased to exist that there is no longer any just occasion for hold-
ing the company to that stringent responsibility in reference to
those goods. They are no longer in the course of transporta-
tion, beyond the reach of the owner, and under the exclusive
control and observation of the carrier. The owner has again
got sight of his property, and is in a situation to some extent to
oversee and protect it. Nor is he any longer under the difficul-
ties and embarrassments in attempting to make proof of subse-
quent fraud or negligence as when it was on its passage beyond
the reach of his observation, and under the private control of
the carrier. The facilities and temptations to fraud and collusion
in the embezzlement or larceny of the goods are also removed,
or at least greatly diminished.

It is upon these considerations that the strict liability of the
carrier is founded. "It is a politic establishment," says Lord
*Holt*, in *Coggs* v. *Bernard*, 2 Ld. Raym. 918, " contrived by
the policy of the law for the safety of all persons, the necessity
of whose affairs obliges them to trust these sorts of persons, that
they may be safe in their ways of dealing; for else the carrier
might have opportunity of undoing all persons who had any
dealings with him, by combining with thieves, &c., and yet doing
it in such a clandestine way as would not be possible to be dis-
covered."

In 2 Kent's Com. 602, it is said that the rule subjecting the
carrier to this strict responsibility is founded on broad princi-
ples of public policy and convenience, and was introduced to

prevent the necessity of going into circumstances impossible to
be unravelled. If it were not for the rule, the carrier might
contrive, by means not to be detected, to be robbed of his goods,
in order to share the spoil.

That the danger of loss by such collusion is not now so prom-
inent a consideration as in the semi-barbarous times when the
rule was first adopted, is quite probable. But upon this point it
is well said by the court in *Moses* v. *Railroad*, before cited, that
the immense increase of this business, the great value of the
commodities now necessarily entrusted to the charge of common
carriers, and the vast distances to which they are to be trans-
ported, have multiplied the difficulties of the owner who seeks to
recover for the loss of his goods, and have added greatly to the
opportunities and temptations of the carrier, who might be dis-
posed to neglect or violate his trust. The reasons upon which
the rule is founded apply in all their force to railroad companies
as carriers, and the same considerations of public policy which
lead to its adoption, continue to require that it be maintained in
all its rigor, as to them. Any relaxation of the rule must be
attended only with mischief. Many of the most eminent Eng-
lish judges prior to the acts of II. Geo. IV. and I. Wm. IV.
expressed regret that their courts had sanctioned the doctrine
that the carrier had the right to limit his liability by a public
notice, and predicted the necessity for the legislative inter-
ference which resulted in those acts restoring the strict responsi-
bility of the ancient rule, in order to remedy the mischiefs which
that relaxation had introduced. *Moses* v. *Railroad, quâ sup.*

The inquiry then is, at what moment after the goods con-
veyed by a railroad company in their cars have reached the
point on the line of the railroad where they are to be delivered,
may the reasons upon which the common law liability of the car-
rier is founded be said to cease when there is no person pres-
ent at their arrival authorized to receive them, and ready to take
them away.

That it is the duty of the consignee to come for them is clear,
but it would be quite as impracticable for him to be at the place

of delivery at the precise moment of their arrival, or of their being unladen from the cars, without actual notice to him of their arrival, as it would be for the company to diverge from their line of road in order to deliver them at his place of business, or to send notice to him of their arrival, before proceeding to unload them. The arrival may be in the night, or after the expiration of business hours at the station, or at so late a period before it as to render it impossible for him to get them away within the hours of business. If under such circumstances they have been removed from the cars and placed in the warehouse, it cannot be said that they are so placed and kept there until the gates are opened, and business resumed upon the following day, for any purpose having reference to the convenience and accommodation of the owner or consignee, nor can the proceeding upon any sound view be considered as equivalent to a delivery. The same persons—the servants of the company—continue in the exclusive possession and control of the goods as when they were on their transit, and they are equally shut up from the observation and oversight of all others. The consignee has had no opportunity to know that they have arrived and in what condition, and is in no better situation to disprove the fact, or to question any account the servants of the company having them in charge may choose to give of what may happen to them after they are so removed from the cars, or what has happened prior thereto, than before. If purloined, destroyed, or damaged by their fraud or neglect, subsequently to their removal and before he can have had the opportunity to come for them, he is left to precisely the same proof as if the larceny or injury had occurred while they were actually *in transitu*—the declarations of the servants of the company—they having, it may well be supposed, feelings and interests adverse to him, and knowing that he has no evidence at command from other sources to impeach their statement. It is obvious, too, that the opportunities and facilities for embezzling the goods and for other fraudulent or collusive practices, must continue to be equally tempting after their removal under such circumstances, as before. The risk of detection in some respects

may be made even less than before, by the greater facilities which the servant of the company in charge of the warehouse has of manufacturing evidence of a burglary or creating proof of the destruction of the goods by fire, set by himself for the purpose of concealing his agency in their larceny. For all purposes which have reference to the difficulties and embarrassments in the way of the owner in attempting to prove loss or damage by the fault or neglect of the company, to his inability to give to them any oversight or protection, and to his security against fraud and collusion until he can have reasonable opportunity to see, by his own observation, or that of others than the servants of the company, that they have arrived, and to send for and take them away, he stands in the same relation to them as when they were actually in the course of transportation. The same broad principles of public policy and convenience upon which the common law liability of the carrier is made to rest, have equal application after the goods are removed into the warehouse as before, until the owner or consignee can have that opportunity; and the same necessity exists for encouraging the fidelity and stimulating the care and diligence of those who thus continue to retain them in charge, by holding that they shall continue subject to the risk.

It is no satisfactory answer to this view to say that the company, having provided a warehouse in which to store the goods for the accommodation of the owner, after the transit has terminated, may be regarded, by their act of depositing them in the warehouse, as having delivered them from themselves as carriers, to themselves as warehouse-men. The question still is, when, having a proper regard to the principles which lie at the basis of their carrier liability, and to the protection and security of the owner, can this transmutation of the character in which they hold the goods be said to take place, and this constructive delivery to be made. If this is held to be at any point of time before there can be opportunity to take them from the hands of the company, then may the owner be compelled to leave them in their possession under the limited liability of depositaries, or

bailees for hire, contrary to his intention, and without any act or neglect on his part which may be considered as indicative of his consent thereto.  It may have been his intention to take them from their possession at the earliest practicable moment, for the reason that he may not be disposed to entrust them to their fidelity and care without the stimulus to the utmost diligence and good faith afforded by the strict liability of carriers.  If he neglects to take them away upon the first opportunity that he has to do it, he may be said thereby to have consented that they shall remain under the more limited responsibility.  But upon no just ground can this consent be presumed when his only alternative is to be at the station where they are to be delivered at the arrival of the train, at whatever hour that may happen to be, whether in the night or the day, in or out of business hours, and regardless of all the contingencies upon which the regularity of its arrival may depend.  It is to be supposed that the consignee has been advised by the consignor of the fact that the goods have been forwarded, and that he has taken or is prepared to take proper measures to look for them upon their arrival, and to remove them as soon as he can have reasonable opportunity to do so.  It must be supposed, too, that he is informed of the usual course of business on the part of the company, and of their agents, in the hours established for the arrival of the trains, and in unlading the cars and delivering out goods of that decription, and that he will exercise reasonable diligence in reference to all these particulars, to be at the place of delivery as soon as may be practicable after their arrival, and take them into his possession.  The extent of the reasonable opportunity to be afforded him for that purpose is not, however, to be measured by any peculiar circumstances in his own condition and situation, rendering it necessary for his own convenience and accommodation that he should have longer time or better opportunity than if he resided in the vicinity of the warehouse, and was prepared with the means and facilities for taking the goods away.  If his particular circumstances require a more extended opportunity, the goods must be considered after such reasonable time as but

for those peculiar circumstances would be deemed sufficient to be kept by the company for his convenience, and under the responsibility of depositaries or bailees for hire only.

In the case now under consideration, there was conflicting evidence as to the time when the train by which the wool was carried arrived at the depot in Boston. The evidence on the part of the defence tended to show that it arrived at the usual time—between one and two o'clock in the afternoon; while that of the plaintiff tended to show that it did not arrive until three o'clock. The gates of the depot were closed at five, and from two to three hours were usually required for unloading the cars. Upon the view of the evidence most favorable to the defendants, there was but a period of from three to four hours, at the longest, for the consignee to have come and taken away the wool, before the gates were closed; and it was destroyed before they were reöpened for the purpose of delivering out the goods. This view proceeds upon the supposition that the work of unlading the cars was commenced immediately upon their arrival; and in the process of unloading, ordinarily occupying from two to three hours, the wool happened to be the first article taken from the cars and was at once ready for delivery. Upon a view less favorable to the defendants, the jury might have found, upon the evidence in the case, that the train arrived at three, and that the wool was unloaded at six—one hour after the closing of the gates. That the verdict in answer to the second question submitted to the jury was therefore warranted by the evidence, is quite clear; and as there are no legal exceptions to the proceedings upon the trial, so far as they relate to this point, the answer of the jury to that question establishes the fact that the consignees had no reasonable opportunity, after the wool was taken from the cars, to come and inspect it, so far as to see whether from its outward appearance it corresponded with the letter of advice from their consignor, and to remove it before it was destroyed. This fact being established, upon the views of the law entertained by the court the transit had not terminated, and the defendants continued liable for the wool as carriers down to and at the time of

the loss ; and the general verdict entered for the plaintiff may well be sustained upon the original and the second and fourth amended counts.

We are aware that this view of the liability of railroad companies as carriers conflicts with the opinion of the Supreme Court of Massachusetts, as pronounced by the learned chief justice of that court in the recent case of *Norway Plains Co.* v. *these defendants*, 1 Gray 263. In that case it was held that the liability as carriers ceases when the goods are removed from the cars and placed upon the platform of the depot, ready for delivery, whether it be done in the day time or in the night—in or out of the usual business hours—and consequently irrespective of the question whether the consignee has or not an opportunity to remove them. The ground upon which the decision is based would seem to be the propriety of establishing a rule of duty for this class of carriers of a plain, precise and practical character, and of easy application, rather than of adhering to the rigorous principles of the common law. That the rule adopted in that case is of such character is not to be doubted ; but with all our respect for the eminent judge by whom the opinion was delivered, and for the learned court whose judgment he pronounced, we cannot but think that by it the salutary and approved principles of the common law are sacrificed to considerations of convenience and expediency, in the simplicity and precise and practical character of the rule which it establishes.

It is unnecessary, then, to consider the exceptions taken upon the other view of the case, as an action against the defendants for negligence in their care of the wool after their liability as carriers had ceased.

*Judgment upon the verdict.*