DECEMBER 18, 1874. }   JEWELL *v.* GRAND TRUNK RAILWAY.

Common carriers are bound to deliver freight, consigned to them for transportation, at a place suitable and reasonable for the consignee to receive it; and whether any given place answers this requirement is a question for the jury, under proper instructions from the court.

The rule would be the same if their liability as common carriers had ended, and the goods remained in their possession as warehousemen or depositaries.

The liability of a master for the negligence of his servant extends only to such acts or omissions as come within the scope of the servant's employment. Therefore, where the servant of a railway corporation, not having authority from the corporation to employ other servants, engaged one G. to assist him in moving a crate of crockery, and, through the negligence or inefficiency of G., combined with the carelessness of the servant, the crate was overturned, striking the plaintiff, whereby it was claimed he suffered a severe injury—*Held*, that the corporation was not liable for the negligence of G., nor for the fault of their servant in employing G. to assist him, even admitting G. to have been an unsuitable and improper person to engage for that service.

If the consignee of goods accepts a delivery at a place or in a manner different from what a common carrier is liable by law to deliver them, the business of removing them becomes from that time his business, and the carrier cannot be held liable for the acts or omissions of those employed to do the work.

When the duty of a common carrier as to the delivery of freight has ended, no custom or practice of his servant in assisting consignees in moving or loading their goods can affect the principal.

CASE, commenced in the lifetime of Levi D. Jewell, who died before the trial, to recover damages for a personal injury to the deceased alleged to have been caused by the carelessness and neglect of Thomas Monneghan, an employé of the defendants, in wheeling out and placing

upon the platform of the defendants' freight-house, at Gorham, N. H.,
a crate of crockery belonging to C. L. Plaisted, of Jefferson.    Plea, the
general issue.

The plaintiff, who is the widow of the deceased, and was his wife at
the time of the injury, was offered as a witness by her counsel.    The
defendants objected to her testifying on the ground of incompetency,
but the court allowed her to testify; to which the defendants excepted.
The court was of the opinion (and so stated) that her examination
would not (and it did not) lead to any violation of marital confidence.

It appeared that on November 24, 1869, the deceased was in the
employ of Mr. Thompson, of the Glen house, who sent him on that
day with a four-horse team to the defendants' depot, at Gorham, to
obtain some freight.    When he arrived at the freight-house, he found
the team of Mr. Plaisted backed up to the platform at a point nearly
opposite the freight-house door, and two men in Plaisted's employ were
there.    Said Jewell backed his team up to the platform from four to
six feet to the right of Plaisted's team, and, upon his freight being
pointed out to him by said Monneghan, he took it and loaded it into
his wagon.    Plaisted's freight consisted of said crate of crockery
weighing 620 lbs., and several smaller articles, which Monneghan had
pointed out to his men (Otis A. Garland and John Nutter) inside the
freight-house, and which, with the exception of the crate, they had taken
and loaded.    Garland requested Monneghan to assist in wheeling
the crate to the platform.    He did so, using a pair of low warehouse
trucks, Monneghan wheeling the trucks and Garland steadying the
crate as it moved along.    In unloading it from the trucks on to the plat-
form, the crate tipped over, and one corner of it hit Jewell on his right
shoulder and injured him.    Said Jewell was then standing upon the
ground between the platform and the hind end of his wagon adjusting
the tail-board, the space between being just wide enough for him to
stand in.    The platform was about eight feet wide, and as Jewell stood
on the ground it was nearly as high as his shoulders.    The bottom of
his wagon was about on a level with the platform.    The crate was about
4½ feet long, 3 feet wide, and 2 or 2½ feet thick, and was loaded length-
wise upon the trucks, and, in unloading it, it was necessary to set it
upon the end.    In so doing Garland attempted to hold it, but in conse-
quence of the carelessness of Monneghan in depositing it upon the
platform, or of the inefficiency of Garland in holding it, or for both of
these reasons, it went over, hitting Jewell as before stated, and leaving
about 4 inches of the crate projecting beyond the edge of the platform.
Plaisted's freight arrived at Gorham depot the preceding day, and was
taken out of the cars and set apart for him, or placed for safe-keeping
in the defendants' freight-house, about 30 feet from where his wagon
stood at the time of the injury, and about 18 feet from the door, and
remained there until it was pointed out to his men by Monneghan.    It
did not appear that any goods or other obstruction was between Plais-
ted's freight and the place where his wagon stood.    Monneghan was
employed as porter for the defendants about the station at Gorham, and

had been for many years.   His duty in regard to freight was to unload it from the cars, put it in some convenient place inside the freight-house, keeping each man's freight by itself, and when called for to point it out to the consignee and deliver it, so far as the defendants were bound in law to deliver it, either at that point or upon the platform outside or elsewhere.   Thomas H. Cooper, the defendants' superintendent, testified that it was no part of Monneghan's duty or service for the defendants to deliver freight upon the platform, or to load it for the consignees, but he did not deny that it was Monneghan's duty to do whatever it was incumbent on the defendants to do in the matter of delivering freight at Gorham.

The plaintiff's evidence tended to show that it was the ordinary custom of Monneghan to move heavy articles like this crate of crockery from inside the freight-house to the platform when they were called for, and deliver them there ; but the defendants' evidence tended to show that, at the request of the consignees, when not otherwise engaged, he had occasionally assisted in moving such articles.   The plaintiff did not claim that the defendants were bound to furnish assistance in loading this crate upon Mr. Plaisted's team.

Upon the question of liability, the defendants' counsel requested the court to instruct the jury,—

1. That if Plaisted's freight was received at the Gorham depot, unloaded, and carefully set aside in the defendants' warehouse, in a place reasonably accessible to the owner when called for, and the same was pointed out to him when called for, the defendants' duty as to making delivery of the same, or of forwarding it further, was at an end ; that the defendants were under no legal obligation to deliver it upon the platform outside of their warehouse, or to load it upon the consignee's wagon, and cannot be held liable for Monneghan's acts in wheeling out the crate of crockery to the platform after pointing it out as aforesaid, as this would be no service the defendants had contracted or were bound to do for Plaisted ; that in doing this service, Monneghan would not be the servant of the defendants.

2. That in order to hold the defendants liable, the jury must find that Monneghan was their servant, and, in performing the act of wheeling the crate of crockery to the platform, was acting within the scope of his employment as such servant, and that his carelessness as such servant in wheeling or in unloading said crate caused it to tip over and injure the deceased.

3. That the defendants are not liable for any negligence or carelessness of said Garland ; that he was not the servant of the defendants, and they are in no respect liable for his acts.

4. That even if the defendants were bound as a matter of law to deliver Plaisted's freight on the platform, still, he or his teamster might, if he chose, receive the delivery of it, inside the freight-house ; that the testimony of Garland and Monneghan is competent evidence from which the jury may find that the Plaisted freight was in fact delivered and accepted in the freight-house ; and if it was thus deliv-

ered and accepted, then the question whether or not the defendants were bound to deliver it on the platform or elsewhere does not arise in the case, and the jury need not consider that matter at all; and in such case, Monneghan's act in wheeling out and assisting in unloading the crate would be his own voluntary matter, the defendants not being responsible even if he was careless in doing it.

The court did not give these instructions, except as is hereinafter stated.

The court instructed the jury, that in order to maintain this action the plaintiff must prove that the injury was occasioned by the negligence of Monneghan; that, as the writ did not allege that the defendants were liable on account of any negligence of Garland, they could not be held by reason of any unskilfulness of Garland in steadying or holding the crate,—but that if Monneghan, in wheeling out the crate, was doing a service which it was incumbent on the defendants to do, and he was guilty of negligence in selecting or allowing Garland to assist, instead of securing the service of a fitter assistant, then the defendants might be held liable for the carelessness of Garland in not properly steadying or holding the crate, although Monneghan performed his part of the work skilfully; that, if the unskilfulness in doing the work was none of it Monneghan's, but all Garland's, the defendants might yet be liable, if Monneghan, in the exercise of ordinary care, ought to have selected a fitter person, and ought not to have permitted Garland to assist him; that in order to determine whose servant Monneghan was, in the act of wheeling out the crate, it became necessary to ascertain whether it was incumbent on the defendants to deliver the crate outside of the freight-house; that the defendants were not bound, as a matter of law, to deliver the crate upon the platform, neither had they a right, as a matter of law, to deposit it inside the freight-house, and compel Plaisted to receive it there; that they were bound to deliver the crate in a convenient and suitable place, in which it was reasonable for them to compel Plaisted to receive it; that Plaisted was just as much entitled to receive it in a convenient and suitable place, as if he had been at the freight-house with his team ready to receive it when it was unloaded from the car; that this might be inside the freight-house, or upon the platform outside, or elsewhere, provided it was a convenient and suitable place; that if this crate, in the place where it was inside of the freight-house, was in a convenient and suitable place, where it was reasonable for the defendants to compel Plaisted to receive it, the duty of the defendants had ended when Monneghan pointed it out to Plaisted's men, and the defendants were not liable for any negligence of Monneghan in afterwards removing it from the freight-house to the platform, except by virtue of a custom, as is hereinafter stated; but if the act of Monneghan, in wheeling the crate to the platform, was only to remove it from a place where it was not reasonable to compel Plaisted to receive it to a place where it was reasonable to compel him to receive it, then Monneghan, in this act of removal, remained the servant of the defendants, and they were liable

for his negligence in performing it; that, if the defendants were not bound to deliver the crate upon the platform, it would follow that they were not bound to provide the necessary trucks or appliances to remove such a heavy article, and Plaisted would be obliged to provide them himself; that, if Plaisted's goods were in a convenient and suitable place when pointed out to Garland by Monneghan, there was still one view in which the plaintiff might recover, viz.: If it was Monneghan's ordinary custom, when heavy freight like this crate of crockery was called for by the consignees, after it had been deposited in the freight-house, to remove it to the platform outside, then this would become the service of the defendants, even if their duty had ceased as to the delivery of the goods.

Subject to the modification just stated, the court instructed the jury as requested, that in order to hold the defendants liable the jury must find that Monneghan was their servant, and that in performing the act of wheeling the crate to the platform he was acting within the scope of his employment as such servant, and that his carelessness in wheeling or unloading the crate caused it to tip over and injure the deceased, but that the defendants were not liable for the neglect or carelessness of Garland, except as before stated.

To the foregoing instructions, and because those requested were not given, the defendants excepted.

The court gave satisfactory instructions as to what constitutes negligence, and as to the effect, if negligence on the part of Jewell contributed to the injury.

The plaintiff's evidence tended to show that said Jewell resumed his ordinary work in about two weeks after the accident, and continued to work, with some temporary interruptions, until about January 1, 1871, receiving the same pay and doing the same work, substantially, as before; that he complained, at times, of shortness of breath, pain in his chest and lungs, and lameness in his right leg, and that about January 1, 1871, he was taken sick, quit his work, and grew gradually worse until he died, July 8, 1871.

The defendants' evidence tended to show that said Jewell labored at logging through the winter of 1869–70, that he drove a six-horse passenger coach up and down Mt. Washington during the season of summer travel in 1870, and that he worked at logging in the winter following until he was taken sick, as before stated.

It appeared that his mother and a sister died of consumption. No physicians were called as witnesses by the plaintiff. The defendants called Dr. Folsom, of St. Johnsbury, who saw and examined said Jewell on May 30, 1871; Dr. Tewksbury, of Portland, who saw, examined, and prescribed for him a few days before his death; Dr. Wardwell, of Gorham, who frequently saw him from the time of his injury until he died, and who prescribed for him in January, 1871; and Dr. Adams, of Island Pond. Said physicians (except Dr. Folsom) attended a *post-mortem* examination of said Jewell's remains, and testified that he died from a large cancer, located mainly in the upper part of the

left lung, and all of them testified that in their opinion neither his last sickness and death nor said cancer was in any way attributable to any injury received in November, 1869.   But one of said physicians testified that a person who had a cancerous affection in his blood might live many years without its interfering in any way with his health, strength, or comfort, and without even knowing that anything ailed him, and that this cancerous affection might be concentrated upon some weak or exposed point by a concussion, or by anything that reduced his vital forces, and a latent cancer might be brought out or developed, from which disease and death might ensue, at a time when otherwise the person would have been apparently in perfect health and condition ; and another of said physicians testified that the origin of cancers was often involved in mystery, and that it was in many instances impossible for physicians to ascertain what produced them.

The plaintiff's counsel claimed and argued to the jury that the injury received from the crate of crockery was what probably started the cancer, or caused it to develop at the time it did, and hence that said injury was the proximate cause of said Jewell's last sickness and death.

The defendants' counsel requested the court to instruct the jury, that, as the physicians called by them testified that in their opinion Jewell's death was not in any way attributable to any injury he received in November, 1869, the burden of proof was on the plaintiff to show that such a cancer would be developed by an injury such as he received; that the jury have no right to presume that such a cancer would be developed by such an injury, in the absence of testimony tending to prove it; and that this should be shown by a fair balance of testimony, in order to have the matter considered in the cause.   The court did not give these instructions, unless they are embraced in the following :

The court instructed the jury that the burden of proof was upon the plaintiff in relation to every material point in the case, including this : that they ought to consider the testimony of the physicians, together with all the facts and circumstances of the case, in determining whether the cancer was probably caused or brought out by the injury ; that the defendants were not answerable for the effects of the cancer, unless, upon all the evidence on that point, it was more probable than otherwise that the injury produced it, or brought it out earlier than it would otherwise have appeared ; that, if Jewell had the seeds of cancer in him, or a predisposition to cancer, when he got hurt by the crate, but it would not have been developed so as to affect his health or strength when it did, nor prior to July 8, 1871 (the day of his death), had it not been for the injury, the plaintiff's damages ought not to be diminished because he died from the cancer ; that no damages could be given in this action for the value of a human life; that, if the defendants were liable, the plaintiff might recover the value of the time which Mr. Jewell lost in consequence of the injury, the expense of board, nursing, and medical aid which he received, and a fair compensation for the physical and mental suffering caused by the injury ; that this should include such sum as the jury thought ought to be given on account of

any distress or anxiety of mind he experienced in view of approaching death, provided his last sickness and death were caused by the injury; that the defendants were only liable for the damages which the negligence of their servant occasioned; that they were not liable for that part of his lost time, expense of board, nursing, and medical aid, nor for ' the physical or mental suffering which the cancer occasioned, unless the cancer was produced or devoloped by the injury; that the same force upon a diseased person might entitle him to greater damages than if he had been well; that the question was, How much damage did it do him? and if he would not have suffered in health or strength by the cancer, nor experienced any effect from it prior to July 8, 1871, but for the injury, then the fact that he was predisposed to have a cancer sooner or later ought not to reduce the damages.

To these instructions, and because those requested were not given, the defendants excepted.

The court instructed the jury (by consent of the plaintiff's counsel) that the plaintiff could not recover exemplary damages.

The court requested the jury to answer the following questions, to which they returned the following answers, the foreman reporting that they were unable to agree upon an answer to the fifth question:

1. Was there any want of ordinary care on the part of Mr. Jewell in being where he was at the time he received the injury? Answer—No. 2. Did want of ordinary care on the part of Mr. Jewell contribute to the injury to such an extent that if he had exercised ordinary care he would not have received the injury? Answer—No. 3. Was there any want of ordinary care on the part of Mr. Monneghan in removing the crate from inside the depot, and depositing it upon the platform? Answer—Yes. 4. Did the crate fall upon Mr. Jewell, and do the injury he received, in consequence of want of ordinary care in doing what they undertook to do on the part of Mr. Monneghan, or of the person who assisted him, or both,—and if so, on the part of which? Answer—Both of them. 5. Was there any want of ordinary care on the part of Mr. Monneghan in not having a more suitable person than he did have to steady the crate, and hold it when he tipped it from the trucks? [No answer.] 6. Was the crate, when Mr. Plaisted's men called for it, in a convenient and suitable place for delivery, so that the defendants might reasonably compel Mr. Plaisted to receive it at that place? Answer—No. 7. Was it necessary that the crate should be removed from its place inside the depot to the platform, in order to get it to a convenient and suitable place, where the defendants might reasonably compel Mr. Plaisted's men to receive it? Answer—Yes. 8. Did Mr. Plaisted exercise reasonable diligence in sending for his goods, assuming that he had due notice of their arrival, and that he was bound to send for them as early as if he had resided in the vicinity of the depot, and that he was prepared with the means and facilities for taking them away? Answer—Yes. 9. Did the man to whom Mr. Plaisted entrusted the duty of going for his goods undertake to accept the crate inside of the depot, or to relieve the defendants from any duty which they were bound

to perform in relation to its delivery? Answer—No. 10. After goods, requiring the use of warehouse trucks to remove them, had been taken from the cars into the depot, was it, on and prior to the day of the injury, the ordinary custom of Mr. Monneghan to assist with the trucks in removing them to the platform when a team came to receive them? Answer—Yes.

The court was not requested to give to the jury any instructions, and did not give them any, upon the point whether the liability of the defendants in this action would be in any way affected by their finding one way or the other upon the eighth question; nor did the court instruct the jury that their finding upon the ninth question would be in any way material in the decision of the cause.

The jury found a verdict for the plaintiff, assessing damages at $960, which the defendants moved to set aside; and the questions arising on that motion were reserved.

*Burns & Heywood* (with whom was *Twitchell*), for the plaintiff, cited Sedgwick on the Measure of Damages 654, note; *Illinois Central R. R.* v. *Barron*, 5 Wall. 90.

*Ray & Drew* (with whom was *G. A. Bingham*), for the defendants, cited *Moses* v. *B. & M. R. R.*, 32 N. H. 523; *Smith* v. *N. & L. R. R.*, 27 N. H. 86; *Flower* v. *Adam*, 2 Taunt. 314; *Marble* v. *Worcester*, 4 Gray 395–397; *Cook* v. *Charlestown*, 98 Mass. 80; *Tutein* v. *Hurley*, 98 Mass. 211.

SMITH, J. The defendants' first request for instructions to the jury was properly refused. It assumes, as a matter of law, that the warehouse was a reasonable place to require Plaisted to accept the delivery of his freight. The instructions of the court were, in substance, that the defendants were not bound, as a matter of law, to deliver the crate upon the platform outside the freight-house, neither had they a right, as a matter of law, to deposit it in the freight-house and compel Plaisted to receive it there; but they were bound to deliver the freight in a convenient and suitable place in which it was reasonable for them to compel Plaisted to receive it, which might be inside the freight-house, or upon the platform outside, or elsewhere. It is a question for the jury, under the circumstances of each particular case, to say what, under proper instructions from the court, would be reasonable in this respect, and this irrespective of the question whether the defendants were liable to Plaisted as common carriers or depositaries. I do not think it necessary to inquire whether the defendants, at the time of this accident to Jewell, were liable to Plaisted in the one capacity or the other; for in whichever capacity they were liable they were bound to deliver the goods to Plaisted. This might have been by pointing them out to him in their warehouse, provided that were reasonable; or it might have been by delivering them elsewhere, provided that were reasonable, as the jury might find. The period when the liability of railroads as common

carriers ends was very fully discussed in *Moses* v. *Boston & Maine Railroad*, 32 N. H. 523, and their liability as depositaries was also fully discussed in *Smith* v. *Nashua & Lowell Railroad*, 27 N. H. 86; and we see no occasion to review the law as laid down in those cases.

The defendants' second and third requests for instructions were substantially granted in the instructions by the presiding justice to the jury; but the qualification, that the defendants would be liable if Monneghan, in the exercise of ordinary care, ought to have selected a fitter person, and ought not to have permitted Garland to assist him, if they should find the accident was owing to the carelessness of Garland, I think was erroneous. The declaration alleges an injury done the plaintiff by the defendants' servant, Monneghan, in carelessly wheeling out and placing on the platform the crate of crockery. There is no allegation that it was done by Garland, or that Garland was a servant of the defendants, or that the defendants, or their servant Monneghan, were guilty of negligence in procuring or permitting Garland to aid in the removal of the crate. And if it had been properly alleged that the defendants' servant, Monneghan, was guilty of negligence in procuring an unsuitable person to assist in the removal, I think the cause would be too remote. The proximate cause of the injury would be Garland's negligence. The allegation would be for a cause that created a cause that did the injury,—that is, that Monneghan's negligence employed Garland, a negligent person, who committed the wrong or injury through negligence. It is not necessary to enlarge upon the rule of very general application in the law, "*In jure, causa proxima, non remota, spectatur*," nor upon the maxim of the schoolmen, "*Causa causantis, causa est causati*," further than to add, in the words of SHAW, C. J.,—"The law looks to a practical rule, adapted to the rights and duties of all persons in society, in the common and ordinary concerns of actual and real life; and, on account of the difficulty in unravelling a combination of causes, and of tracing each result, as a matter of fact, to its true, real, and efficient cause, the law has adopted the rule, before stated, of regarding the proximate and not the remote cause of the occurrence which is the subject of inquiry." *Marble* v. *Worcester*, 4 Gray 395; *Cook* v. *Charlestown*, 98 Mass. 80; *Tutein* v. *Hurley*, 98 Mass. 211.

The jury, by their answer to the fourth question, found that the accident was the result of the joint negligence of Monneghan and Garland. But, having failed to agree upon an answer to the fifth question, whether there was any want of ordinary care on the part of Monneghan in not having a more suitable person than he did to assist him in moving the crate, the defendants claim that a verdict should have been ordered for them, because it does not appear that the negligence of Monneghan alone, in wheeling the crate, was sufficient to cause the accident, and because they are made liable for the negligent act of Garland, or the joint negligence of Garland and Monneghan. It is true that there was no special finding of the jury upon the question of whether Monneghan's negligence was sufficient; and, had a general

verdict been ordered by the court, it might have been necessary to set the verdict aside. But the case states that the jury found a verdict for the plaintiff; and I think it must follow that it was found on account of the negligent act of Monneghan, and that his negligence alone was sufficient to cause the injury. The instructions of the court were that they must find, in order to entitle the plaintiff to recover, that Monneghan's carelessness, in wheeling or unloading the crate, caused it to tip over and injure the deceased; and that the defendants were not liable for the neglect or carelessness of Garland, except as before stated.

As the verdict is to be set aside upon another ground, the question is only important in the event of a new trial.

The defendants' fourth request for instructions was as follows:

"That, even if the defendants were bound, as a matter of law, to deliver Plaisted's freight on the platform, still he or his teamster might, if he chose, receive the delivery of it inside the freight-house; that the testimony of Garland and Monneghan is competent evidence, from which the jury may find that the Plaisted freight was, in fact, delivered and accepted in the freight-house,—and if it was thus delivered and accepted, then the question, whether or not the defendants were bound to deliver it on the platform or elsewhere, does not arise in the case, and the jury need not consider that matter at all; and, in such case, Monneghan's act in wheeling out and assisting in unloading the crate would be his own voluntary matter, the defendants not being responsible even if he was careless in doing it."

We think the instructions asked should have been given.

It was the duty of the defendants to transport the goods, and deliver them to Plaisted from their cars or at their freight-house. But the duty might be modified as to the manner of its performance. The general duty of the defendants as common carriers was, to make a true delivery of the goods at the usual place, which was from their cars or at their depot; but we think it must be entirely clear that it was competent for Plaisted to assent to a delivery elsewhere, and if he accepted the delivery of his goods elsewhere he thereby assumed the further responsibility, and the defendants were exempted from the duty of making any other or different delivery. *Lewis* v. *Western Railroad*, 11 Met. 509. In that case, it is remarked by DEWEY, J.,—" Suppose a bale of goods was transported by them [the defendant railroad], and on its arrival at the depot the owner should step into the car and ask for a delivery there, and thereupon the goods should be passed over to him in the car: the delivery would be perfect; and, if any casualty should subsequently occur in taking out the bale, the loss would be his. The place and manner of delivery may always be varied with the assent of the owner of the property; and, if he interferes to control or direct in the matter, he assumes the responsibility."

In the case at bar, when Plaisted's team came for his goods, the several packages were pointed out to his servants, Garland and Nutter, by Monneghan, the servant of the defendants, inside the freight-house.

So far as the case finds, no claim was made by them that the place

inside where the goods were deposited was not convenient and suitable, or that they were entitled to have the goods delivered to them upon the platform outside; but they took and loaded all the articles except the crate. That they did this, and did not call upon Monneghan to do it, or claim that he should deliver the goods outside upon the platform, was evidence for the jury to find an acceptance of them by Plaisted's servants inside. Garland then *requested* Monneghan to assist in wheeling the crate to the platform. This request was also evidence, from which it was competent for the jury to find a delivery accepted inside. It is true that the jury answered the ninth question,— " Did the man to whom Plaisted entrusted the duty of going for his goods undertake to accept the crate inside the depot, or to relieve the defendants from any duty which they were bound to perform in relation to its delivery ?"—in the negative; but the case also finds that the court " did not instruct the jury that their finding upon the ninth question would be in any way material in the decision of the cause."

I think here was evidence from which the jury might have found a delivery and acceptance of the goods inside the freight-house, and that the defendants' request should have been granted. If the instructions asked for had been given, and if the court had instructed the jury in what respect their finding " would be material in the decision of the cause," their finding upon the ninth question might have been different. However that may be, the defendants were entitled to have the jury properly instructed on this point; and because they were not, the verdict must be set aside.

It necessarily follows, that if there was a delivery and acceptance of the goods inside the depot, Monneghan's act, in wheeling out and assisting in unloading the crate at the request of Plaisted or his servants, would be his own voluntary matter, and the defendants would not be responsible for his negligence.

The jury were also instructed, that " if it was Monneghan's ordinary custom, when heavy freight like this crate of crockery was called for by the consignees after it had been deposited in the freight-house to remove it to the platform outside, then this would become the service of the defendants, even if their duty had ceased as to the delivery of the goods." We are unable to assent to the law as here laid down. The terms " custom " and " usage " are often used indifferently. " Their true office is, to interpret the otherwise indeterminate intentions of parties, and to ascertain the nature and extent of their contract, arising not from express stipulation, but from mere implications and presumptions and acts of a doubtful and equivocal character," etc. 2 Gr. Ev., sec. 251. Evidence of Monneghan's custom in this respect was admissible, as showing the nature of the defendants' contracts as to the transportation and delivery of freight, and as bearing upon the particular mode and place of delivery of heavy freight, and, as the plaintiff's counsel says in his brief, is evidence of the extent of Monneghan's services. But still it is a question of fact for the jury to say, upon all the evidence and circumstances in the case, including the

evidence of custom, what the defendants' contract or undertaking, as to the mode and place of delivery of freight, was.   But the instructions went further than this, and the jury were told that the ordinary custom of Monneghan to remove heavy freight from the inside to the platform outside, *even after* the defendants' duty had ceased as to the delivery of the goods, would become the service of the defendants.   It is difficult to see how, after the defendants' duty had ended as to the delivery of freight, any custom or practice of Monneghan's, in assisting consignees in moving or loading their goods, can affect the defendants.   The defendants are only responsible for their servant's acts when acting within the line of his duty, and within the line of their duty to their consignees.   When that duty has ended, they are no more responsible for his acts and doings than for the acts and doings of any other person.

The instructions requested by the defendants upon the question of damages were given in substance, though not in the form asked for.   If, as seems to be generally conceded, the jury found that the accident caused or accelerated the disease of which Jewell died, the greater part of the large sum assessed by them in damages must have been on that account.   Their finding upon this point seems to be overwhelmingly against the *weight* of evidence.   They had the unsatisfactory, unsubstantial, and unreliable theories or speculations of one of the physicians, as to the origin and growth of this mysterious disease, upon which to ground their finding.   In *Wendell* v. *Safford*, 12 N. H. 175, it was held—GILCHRIST, J., delivering the opinion of the court—that " courts of law possess the power, and it is often their duty for the purposes of justice, to set aside a verdict where it is decidedly against the weight of the evidence."

As this verdict is set aside upon other grounds, it does not become necessary to inquire whether it is not " so decidedly against the weight of evidence as to make it apparent that the jury must have been misled, or have failed to consider ·intelligently the evidence laid before them."   *Clark* v. *Cong. Society*, 45 N. H. 334.   But as that necessity does not arise, there is no occasion to discuss this branch of the case further.

The plaintiff was properly admitted to testify—Gen. Stats., ch. 209, sec. 20—except so far as would lead to the violation of marital confidence—*Ib.*, sec. 21 ; but as no marital confidence was violated, no exception lies to the admission of her testimony.

CUSHING, C. J.   I cannot see in the case any evidence which the jury were entitled to consider as tending to show that the disease of which the plaintiff's intestate died was occasioned by the injury received from the falling crate.   Few things are more difficult, and require more close observation, than the just determination of the causes of disease, or the effects of injuries to the person.   Ordinarily it requires a close observation of skilful men, actually examining the patient, to reach any reliable conclusion.   In this case, all the witnesses whose opinions were taken had seen the patient.   They all had an opportunity of seeing and

noticing the multitude of indications, many of which are indescribable, but which reveal to the practised eye and ear and touch of the skilful surgeon what is necessary to be known about his patients.

The same experts, who expressed their opinion as to the possibility of the disease being occasioned by the accident, were decisive in their opinions that it was not so occasioned. The instructions of the court on the point virtually authorize the jury to go into the regions of conjecture, and to undertake themselves to form opinions on matters entirely beyond their skill, and concerning which they could not possibly have the information necessary for the formation of intelligent opinions. I think, on the whole, there was no evidence in the case on which the jury were authorized to find that the disease of which the plaintiff's intestate died was occasioned by or connected with the injury received from the falling crate.

LADD, J. I agree that this verdict must be set aside and a new trial granted, for the reasons given by my brother SMITH. I also agree with the chief justice, that the case shows no evidence upon which the jury could legally find that the death of the plaintiff's intestate was caused or accelerated by the injury. It seems to me it would be a reproach upon the administration of the law if such mere speculative possibilities, unsustained by proof, were permitted to become the basis of awarding heavy damages in cases of this sort.

*Verdict set aside and a new trial granted.*