## THE CHICAGO AND ALTON RAILROAD COMPANY
### *v.*
## POLLY ANN SCOTT.

1. CARRIERS OF GOODS — *whether they should give notice to the owner or consignee, of the arrival of the goods.* It has been held that carriers by railroad are neither bound to deliver the goods carried, to the consignee personally, nor to give notice of their arrival, to discharge their liability as carriers ; and while the better rule would seem to be, that the owner or consignee should be notified of their arrival, at the earliest practicable moment, yet the rule is settled that such notice is not necessary.

2. SAME — *what they may do with the goods on their arrival.* When the goods have reached their destination, if the consignee is not present to receive them, the carrier may store them safely in a suitable warehouse, to await the demand of the consignee.

3. SAME — *when the liability of the carrier terminates.* When the goods are thus stored, the duty and liability of the railroad as a common carrier terminates, and that of the warehouseman begins.

4. SAME — *when the liability of the carrier becomes changed to that of warehouseman.* If the goods are stored in a warehouse owned by the carrier, his liability as carrier changes to that of a warehouseman. The consignee not being present on the arrival of the goods, to take them into his own control, the presumption is, that he has elected to permit them to be stored by the company, to be held as warehousemen, or keepers for hire.

5. WAREHOUSEMAN — *degree of care required of them.* When the carrier assumes the new duties of warehouseman, he is bound to ordinary care and diligence in the preservation of the property.

6. The building in which the goods are stored must be a safe one ; a fireproof building is not required, but it must be safe. It should be under the charge of careful and competent servants, and in case of threatened danger from fire in the vicinity, ordinary diligence must be used to remove the property to a safe place.

7. SAME — *what constitutes ordinary care and diligence.* Ordinary diligence is such diligence as men of common prudence usually exercise about their own affairs, and ordinary care is such care as every prudent man takes of his own goods. These are facts, to be determined in each case by the jury.

APPEAL from the Superior Court of Chicago; the Hon. JOSEPH E. GARY, Judge, presiding.

On the 11th day of October, 1865, the appellee delivered to the appellant, in Springfield, twenty-seven sacks of wool, to be transported by appellant's railroad to Chicago. The wool was consigned to Pixley, Hall & Livermore, commission merchants, in Chicago. The wool reached Chicago on the 13th day of October, and on the 14th day of that month was stored by the appellant in its depot, to await the order of the consignees. On the 16th day of October, about six o'clock in the evening, a fire broke out in a feed mill, unconnected with the depot, and on the opposite side of the street, which within half an hour's time communicated itself to the depot, and consumed it with its contents. An action was thereupon commenced by the appellee to recover the value of the wool, of the appellant, and, upon the trial, the jury found for the appellee, and, a motion for a new trial made by the appellant being overruled, this appeal was taken.

The particular facts upon which the liability of the company depends, are set forth in the opinion of the court.

Mr. A. W. CHURCH, for the appellant.

The appellant having transported the wool in the declaration mentioned, to Chicago, and, upon its arrival no one being present to receive it, having stored it in its warehouse to await the order of the consignee, held it thereafter as a gratuitous bailee, and was liable for its loss only in case of gross negligence.

The contract for the carriage of the goods was terminated by their arrival in the city of Chicago, and their storage in the appellant's depot. Upon this point there can be no doubt. It is

too well settled to admit of question. *Richards* v. *The M. S. & N. I. R R.*, 20 Ill. 404; *Porter* v. *The Chi. & R. I. R. R. Co.*, id. 407.

It is contended, however, by the appellee, that the price paid for the carriage of the goods furnished a consideration also for an implied·agreement on the part of the carrier to keep the goods safely for a reasonable time until they could be called for bp the consignee, and that during that time the appellant was charged with the duties and liabilities of a warehouseman for hire.

In support of this position the appellee's counsel rely upon a dictum in the case of *The Norway Plains Company* v. *The Boston and Maine Railway*, 1 Gray, 263, where it is stated that the contract for carriage implies also an undertaking on the part of the carrier, that, if the consignee is not ready to take them, he will place them securely and keep them safely a reasonable time, ready to be delivered when called for; that though there be no separate contract for storage, yet the freight fixed by the company to be paid as a compensation for the whole service is paid as well for the temporary storage as for the carriage. It will be observed, however, that the point which we are discussing was not raised in the above case. The railway company were sued as common carriers for the loss of the goods, and the question decided was whether its liability as a common carrier for their safety continued after the arrival of the goods at their place of destination. No point was made upon the liability of the defendant as warehouser, and the question whether the company in such case was a gratuitous bailee, was not raised.

The same may be said of the case of *Thomas* v. *The Boston and Providence Railway*, 10 Metc. 472, which decided merely that where suitable warehouses are provided, and the goods which are not called for, on their arrival, are unloaded and stored safely in such warehouses, the duty of the proprietors as common carriers is terminated.

As this court cite with approval the dictum in the case in 1 Gray, in deciding the case of *Porter* v. *The Chicago and Rock*

*Island R. R. Co.*, 20 Ill. 407, we propose on the part of the appellant to show that it is not supported by precedent.

Says Mr. Angell, in discussing this question : " A common carrier, therefore, when his responsibility as such is thus changed to that of a warehouseman, is in the same situation as if he had offered to deliver the goods at the residence of the consignee ; that is, he has fulfilled his contract as a carrier, and if the hire is not paid, he is not bound to part with the possession of the goods, but he may lawfully take them back to his warehouse or place of business, and he holds them thenceforward not as a common carrier, but as a bailee for hire, or if by agreement, he is not to charge warehouse rent, as a gratuitous bailee." Angell on Carriers, §§ 304, 320.

Mr. Parsons, in his work on contracts, uses the following language : " As the carrier is bound to deliver the goods, so the owner is bound to receive and remove them, and to pay the freight for them ; and if the carrier is warranted in delivering the goods by keeping them at his own office or warehouse and giving notice, and if he has given such notice and the owner delays more than a reasonable time to take them, they are no longer at the risk of a carrier as a carrier, but as a mere depositary, gratuitously, when he is bound only to use slight care, and liable only for gross negligence, or for compensation, when he is bound to ordinary care and is liable for ordinary neglect, according to the circumstances. So, if the freight be not paid and the carrier retains the goods therefor, they are not at his risk as carrier, but as a warehouseman or gratuitous bailee." 2 Parsons on Contracts, book 3, p. 199, 5th edition.

This very question has been fully discussed by the Supreme Court of New Hampshire, and it was there held, that, where goods have arrived at their destination and been stored by the carrier without further charge for such service, they are held by the carrier merely as gratuitous bailees. *Smith* v. *Nashau and Lowell R. R. Co.*, 7 Foster, 86 ; see, also, *Young* v. *Smith*, 3 Dana, 91 ; *Garside* v. *The Trent and Mersey Nav. Co.*, 4 T. R. 581 ; *Morris & Essex R. R. Co.* v. *Ayres*, 5 Dutcher, 393 ; see, also, *Storr* v. *Crawley*, McClell. & You. 136 ; Senator VER-

PLANCK's opinion in *Powell* v. *Myers*, 26 Wend. 597; *In re Webb*, 8 Taunt. (4 E. C. L.) 449. The position of the appellee that the contract for carriage includes also an agreement to keep the goods safely a reasonable time after their arrival cannot, we think, be successfully maintained. This court has expressly decided that the carrier has a right to charge storage. *Ill. Cent. R. R. Co.* v. *Evans*, 20 Ill. 29; *Richards* v. *M. S. & N. I. R. R. Co.*, id. 404. And if he charges storage for the goods he is to be considered a bailee for hire with the ordinary responsibilities of such bailees. If, having a right to charge storage, it is his custom to charge none, then he becomes a mere depositary, a gratuitous bailee, liable for gross negligence only, and not responsible to the owner of the goods if he takes the same care of them that he does of his own. We think, therefore, that in deciding that the compensation paid for the carriage of the goods included also a consideration for their temporary storage at the end of the route, thus rendering the appellant a warehouseman, for hire, was error in the court below, such as to entitle the appellant to a new trial of this case.

Mr. B. D. MAGRUDER, for the appellee.

The liability of the railroad, in this case, is that of a warehouseman for hire. The payment of freight for the carriage of the goods from Springfield to Chicago, included payment for their storage for a reasonable time in the warehouse of the company, after their arrival in Chicago. In this case the contract to carry and to store after the carriage was ended, in consideration of the payment of freight, was mutually beneficial to the bailor and the bailee. *The Norway Plains Company* v. *Boston & Maine Railway*, 1 Gray, 263; *Porter* v. *The Chicago & R. I. R. R. Co.*, 20 Ill. 407; *Thomas* v. *Boston & Providence R. R. Corp.*, 10 Metc. 472; Angell on Carriers, § 303.

Consequently, the railroad company, being a warehouseman for hire, was bound to exercise ordinary diligence in the care of the wool in controversy in this suit, while it remained in the

company's warehouse. Angell on Carriers, § 45 and note; id. § 75.

That may be said to be ordinary diligence, in the sense of the law, which men of common prudence generally exercise about their own affairs. Ordinary care is such as every prudent man commonly takes of his own goods. Angell on Carriers, §§ 7, 11, and note to 45.

Whether or not the railroad company has exercised ordinary diligence or been guilty of ordinary negligence in this case is a question of fact, to be determined by the jury, upon a view of all the facts and circumstances in the case. Angell on Carriers, §§ 7, 11.

The law requires that the warehouse, in which the company stores its freight, shall be a safe and secure place. *Thomas* v. *Boston & Providence R. R. Corp.*, 10 Metc. 472; Angell on Carriers, § 303; *Illinois Central R. R. Co.* v. *Alexander*, 20 Ill. 29; *Porter* v. *Chicago & Rock Island R. R. Co.*, id. 411; *Norway Plains Co.* v. *Boston & Maine Railway*, 1 Gray, 263; 24 Ill. 469.

The law required of the company, that they should store the wool in question under the charge of *careful and competent servants*. *Porter* v. *Chicago and Rock Island R. R. Co.*, 20 Ill. 407, and cases there cited.

The law required of the company, that they should make an effort to save the goods in this warehouse.

As appears from section 58 of Angell on Carriers (2d ed.), and also from the case of *Powers* v. *Mitchell*, 3 Hill (N. Y.) 545, a warehouseman had certain goods belonging to another, in his warehouse. The warehouse and its contents were destroyed by a sudden freshet. The warehouseman was only excused from his liability to the owner of the goods, because " every exertion was made by the defendant's servants to save the goods from injury."

Mr. GEORGE F. BAILEY, on the same side, cited *Porter* v. *The Chicago and Rock Island Railroad Company*, 20 Ill. 407; *The Norway Plains Company* v. *Boston and Maine Railway*, 1 Gray, 263; *Thomas* v. *Boston and Providence Railroad Corporation*, 10 Metcalf, 472.

Mr. Justice Breese delivered the opinion of the Court:

The wool which was destroyed was placed on appellant's cars at Springfield, on the eleventh day of October, to be carried to Chicago, a distance of about one hundred and eighty miles, ordinarily run by freight trains in ten hours. It must have reached Chicago at farthest on the twelfth, and was then suffered to remain on the track in the car until the fourteenth, when it was placed in a building used by appellants as a warehouse, in which it was consumed by fire on the evening of the sixteenth. This court said in the case of *Porter* v. *The Chicago and Rock Island R. R. Co.*, 20 Ill. 407, that carriers by railroad were neither bound to deliver the goods carried, to the consignee personally, nor to give notice of their arrival, to discharge their liability as carriers. But they must take proper care of the goods by safely storing them, or by some other act. When the articles have reached their destination and have been removed and stored in a warehouse, owned by the carrier or by some other party, the duty of the carrier is terminated, and, if the carrier be the owner of the building in which the goods are stored, his liability changes to that of a warehouseman. And in the same case, we say, when the goods have then reached their destination, the owner or consignee by the use of diligence may be there to receive them and take them into his own control, and failing to do so, the presumption should be that he has elected to permit them to be stored by the company, to be held as warehousemen or keepers for hire. The goods are then placed in precisely the same situation as goods in any other warehouse, and the owner has the same opportunity to establish the liability of the company in their new capacity of warehousemen, as he would have, in any other case of a warehouseman.

On reflection, it would seem, if the carrier is not required to give notice to the owner or consignee of the arrival of the goods, he could not know, by the use of any ordinary diligence, when they arrived. Not knowing this important fact, he could not be there to receive them. In this very case, the goods being

shipped on the eleventh, a reasonable calculation would be, they would reach Chicago on the next day; but, as every one knows, who has transacted business with railroads, as carriers of goods, no calculation can be made when they will deliver what they have received. A better rule would seem to be, that the owner or consignee should be notified of their arrival at the earliest practicable moment, after which, if not removed by the owner or consignee, they might be regarded as at their risk as common carriers until they are stored, for the goods remain under the control of the carrier, against whom the law raises every presumption, and requires of him the exercise of the highest diligence, exonerating him from loss in no case, except such loss as might be occasioned by the act of God or the public enemy. But the rule is settled, that no notice is necessary to the consignee, and if he is not present to receive the goods, which he has no means, by the use of ordinary diligence, of knowing have arrived, the carrier can store the goods safely in a suitable warehouse, to await the demand of the consignee. When thus stored, the duty of the railroad as a common carrier terminates, and that of warehouseman begins. The warehouse must be a safe and secure place. *Thomas* v. *Boston and Prov. R. R. Co.*, 10 Metc. 472; Angell on Carriers, § 303; *Ill. Central R. R. Co.* v. *Alexander*, 20 Ill. 29; *Porter* v. *Chi. and Rock Isl. R. R. Co.*, id. 407; *Norway Plains Co.* v. *Boston and Maine Railway*, 1 Gray, 263.

The first question then to be determined is, was this wool stored in a suitable warehouse on its arrival at Chicago?

The answer to this is to be looked for in the evidence in the record, and for an able and careful analysis of it, and which we have tested by the record, we are greatly indebted to one of the counsel for appellee.

The weight of the testimony establishes, most clearly, the fact, that the warehouse, in which this wool was stored, was not safe or suitable. It was a wooden building, two stories high and about eighty by forty feet, originally built for a coal warehouse, and so constructed that the coal trucks could be run from the river side over the street, and the contents poured

down into the building. The building was tall, between six-teen and twenty feet from the sills to the roof. It was near a feed-mill worked by steam, where the fire originated, and lumber was piled up around it. The building had nothing but a shell roof, nothing but boards and shingles, and no floor between the first and second story, so that there was nothing between the roof and the freight to protect it. One witness, Harris, says "this depot was a flash in the pan. It was all open."

Such a building, it is evident, afforded quite an insufficient protection to freight stored in it, and when we consider by what inflammable materials it was surrounded, being located in a lumber and wood-yard, we are satisfied it was not a suitable or safe place in which to store valuable property. The liability to take fire from an adjacent steam-mill was very great, and the difficulty of extinguishing it was rendered insurmountable by the piles of lumber interfering with the movement of the fire engines.

The whole evidence shows it was not a fit building into which freight should be stored. A fire-proof building is not required, but a safe one is.

The next question is, when the wool was placed in this insecure building, did the company have a sufficient guard or watch, in and about it? Was it under the charge of careful and competent servants? The case of *Porter* v. *The Chicago and Rock Island R. R. Co.*, *ante*, and all the other cases, pre-suppose, when goods are stored, they shall be under the charge of careful and competent servants of the company. The evidence on this branch of the case is equally conclusive as that in regard to the insecurity of the building. That being so very insecure, imposed a higher degree of vigilance on the part of the company, and they should have added to its security by the constant attendance of competent watchmen.

What is the fact in this case? The only watchman on the premises was a one-armed man, and devoid of ordinary firm-ness and courage, incapable, by his loss of an important member, to give much aid in removing the goods, when the fire took

place.   All the witnesses concur in saying, if there had been a competent watchman there, or men to attend to the warehouse, with the aid of outsiders, who were present in great numbers, much of the property might have been saved.   There seemed to be no parties there ready to save the property, — not one of the railroad men to open the doors, so that the property might be reached.   The one-armed watchman and one Goodrich, the chief clerk in the freight office, were the only employees of the company that were present, and who did nothing, and attempted nothing, in the way of saving the goods.

The next question, — did the company, by their servants and agents, make timely and sufficient efforts to save this wool?

No effort is shown to have been made until the roof was on fire, rendering it very hazardous for any one to enter the building.   Before that, the evidence is conclusive that sufficient opportunity was presented to have saved much of the property, had proper efforts been made, which were not made.   The law demands that every reasonable exertion should be made to save goods exposed as this wool was exposed.   No authority is necessary to sustain this proposition, for it results from the general principle, that a warehouseman is bound to ordinary diligence in the care of goods intrusted to him.   There seems to be no excuse for this negligence by the company.   There was time enough, if there had been any brains there, in the employment of the company, aided by a thousand bystanders, who were willing to work if they could have been directed by any person what to do at the proper time, to have saved the great bulk, which was not large, of the contents of the warehouse, and certainly this wool, for the proof is, it was in sacks standing on their ends, and within ten feet of the door of the depot, so situated as to be about the first article that would attract the attention of any one entering the depot.   The sacks were in plain view, covered by no intervening article, but in front of them all.   It is very strange, indeed, that the exercise of ordinary diligence should not have resulted in saving this wool.

The suggestion of appellant's counsel that the employees of the company, who were present at the fire, were induced to

believe, by some remarks of Harris, chief of the fire department, that the warehouse was safe, and that the most prudent course was to leave the goods undisturbed in the building, and not expose them to the danger of theft and damage by removing them, loses much of its force when the statements of Harris are considered.

It was, no doubt, the policy of the company, and greatly to their interest, to throw the responsibility of the loss of this wool on the fire department. One of their employees, their one-armed watchman, Metzler, admits the goods might have been saved. But he, and Goodrich, another employee, and clerk in the freight-office, testify that Harris told them that he would save the depot, and that the goods need not be removed. Harris contradicts both these witnesses, and says distinctly that he told them no such thing. He is positive about this, for he says it has always been a settled rule with him never to interfere with the removal of property at fires. This witness was impartial. He had no object or desire to shift the responsibility, and, under the circumstances, his statements were entitled to more weight than those of two frightened and timid and excited employees, and so thought the jury.

It would seem to us, in view of all the facts, that the company did not take the same care of this wool, while it was in their custody, and use the same diligence to save it when in danger of destruction, as an ordinarily prudent man would exercise in regard to his own property. All the facts go to show that it was almost certain, half an hour before the building caught fire, that it would be caught, and, from the materials of which it was built, the length of time it had been erected, causing all the materials to become highly inflammable, surrounded on all sides by combustible materials, and the wind blowing from the feed-mill to the depot, that the warehouse must become a prey to the flames. So thought prudent men who owned property in the immediate neighborhood, who at once made the necessary exertions and saved their property. It is evident the company could have saved this, by proper and timely effort.

We are fully convinced on the whole evidence that the railroad company did not use ordinary care over this property while it was in their custody, nor make sufficient and timely effort to save it, when endangered, and they ought to pay its value to the owner. The new duties the company had assumed, those of warehousemen, required these of them. Angell on Carriers, 45 and note, and 75.

What is ordinary diligence is such diligence, as men of common prudence usually exercise about their own affairs, and ordinary care is such care as every prudent man takes of his own goods. Id. §§ 7, 11.

These are facts to be determined by the jury, and having found that appellants did not exercise this degree of care and diligence, but have been guilty of ordinary negligence, and believing the finding was proper under the evidence, we cannot interfere with their verdict. The proof against appellants on the main points is overwhelming against them, and on the conduct of the chief of the fire department, his testimony is more reliable than that of the two employees of appellants.

No exceptions are taken to the instructions, nor could there be any. The judgment must be affirmed.

*Judgment affirmed.*