THE CHICAGO AND NORTHWESTERN RAILROAD COMPANY

*v.*

EDWIN H. SAWYER.

1. CARRIER—*general rule of his liability.* The liabilities of common carriers are for all losses, even inevitable accidents, except they arise from the act of God or the public enemy. By the act of God is meant something superhuman or something in opposition to the act of man.

2. SAME—*duty in respect to goods shipped in bond.* Where a carrier receives goods for transportation, knowing they are subject to duty to the United States government, and are being shipped from one collection district to another, and that, by the law of Congress and the regulations of the revenue department, they can be delivered only into a bonded warehouse, to be reached in compliance only with certain specific regulations, he impliedly undertakes that the goods shall be safely delivered at the place of their destination in the special manner required, and within a reasonable time, and if a loss occurs in consequence of a neglect of such duty the carrier will be liable.

3. Where a carrier received goods subject to duty, for transportation to Chicago, which, under the laws of Congress and the regulations adopted thereunder, could only be delivered into a bonded warehouse, under the superintendence of some revenue officer, and that could only be done on written notice, which facts were known to the carrier, and the goods arrived at their destination, but the carrier neglected to notify the consignee or the proper revenue officer of their arrival until they were accidentally consumed by fire, it was *held*, that the liability of the carrier, under the circumstances, did not cease upon the arrival of the goods at their destination and that of warehouseman attach, and that the carrier was liable to the consignee for the loss.

APPEAL from the Superior Court of Cook county; the Hon. WILLIAM A. PORTER, Judge, presiding.

The appellee, being an importer of teas, shipped from San Francisco, by railroad, consigned to J. M. Chapman, No. 81 South Water street, Chicago, as one shipment, 354 half chests of tea, for which a bill of lading was issued to him by the carrier, and by him forwarded to Chapman, his agent.

In consequence of the duty to the government not having been paid, these goods were taken from a bonded warehouse in San Francisco to be transported to another collection district, and there delivered into a bonded warehouse, subject to the payment of duties, under the provisions of the act of Congress of March 28, 1854. (Brightley's Dig. U. S. Laws, p. 388.)

In their transit from San Francisco to Chicago, these goods were received from the Union Pacific Railroad by appellant at Omaha, to be carried by the latter, in bond, to Chicago, and there to be delivered at some bonded warehouse.

The 5th section of the above mentioned act authorizes a withdrawal of goods from a bonded warehouse in one collection district and the transportation of them to a bonded warehouse in another collection district. The withdrawal and transportation are subject to the provisions of the 6th section of the same act, and the regulations of the revenue department. These regulations are such, that the carrier could not receive these goods without knowledge of their being in bond, and that their appropriate destination was a bonded warehouse in the city of Chicago.

Appellant did not transport the whole consignment together from Omaha to Chicago, but in two lots, though both arrived in Chicago on October 4, 1871. It appears it was a regulation of the collector's office, for the purpose of preserving records of its transactions, that notices of the arrival of bonded goods, whether by the carrier or consignee, should be in writing, and that it was the uniform custom to so give them. Also, that it was the custom to notify the consignee, because the collector generally followed his choice of bonded warehouses, and, unless he was notified, that could not be ascer-

tained. `As to one lot, being 180 chests, appellant notified Chapman, and, by his directions, they were delivered at the Burlington warehouse, and saved. As to the other lot, being 174 chests, and for the loss of which this suit was brought, no notice was given to Chapman, nor any written notice at collector's office. But it appeared that Wolf, an inspector, in fact knew of their arrival, though it was shown that he had no authority in the premises, nor was it a part of his duty to receive such notices.

It appeared that, although this lot arrived October 4, it was never delivered out of appellant's cars, but the goods were burned in the cars in the great Chicago fire, October 8 and 9, 1871, of which it is stipulated the court may take judicial notice. There is nothing to show that the destruction of the goods arose from the act of God or public enemies.

Mr. GEO. WILLARD, and Mr. B. C. COOK, for the appellant.

Messrs. HOWE & RUSSELL, for the appellee.

Mr. JUSTICE MCALLISTER delivered the opinion of the Court:

This suit was brought by appellee against appellant to recover for 174 chests of tea, shipped by the former, in bond, from San Francisco, being part of an invoice of 354 chests, and received while in transit by appellant at Omaha, to be transported for hire on its cars from thence to Chicago, and there, under the provisions of the act of Congress and regulations of the revenue department in that behalf, delivered into a bonded warehouse.

The entire invoice arrived in Chicago, but in separate lots, on the 4th day of October, 1871. As to one lot, of 180 chests, appellant's agents gave notice to the consignee, whose place of business was denoted by the way-bill, and, by his directions to the collector, that lot was delivered at the Burlington bonded warehouse, with which appellant's track connects, and was

saved. There was where the consignee intended to have the whole invoice delivered, but appellant's agents failed to give him any notice of the arrival of the 174 chests in question, and failed likewise to give any written notice of their arrival at the collector's office; but, relying upon mere personal knowledge of their arrival by an inspector of the collector's department, these goods were permitted to remain in appellant's cars from the 4th until the 8th and 9th of October, when they were burned in the cars.

It is an established fact in the case, that, by the regulations of the collector's office, all notices of the arrival of goods shipped in bond to that port were required to be in writing, and, inasmuch as it was a policy of the office to aid commerce, and there were several bonded warehouses in Chicago, the course of business was, to leave it to the consignee to designate which warehouse he would have the goods deposited in. From this policy sprang a custom of the carrier of goods in bond to notify the consignee of their arrival; and this, the evidence tends to show, was well known to the agents of appellant. But the carrier could secure a delivery by giving a written notice directly to the collector or his deputy. The deputy collector explained, in his evidence, the reason of requiring all notices to be given to the proper officers, and in writing. It was because they were required to keep a record of all their transactions.

The carrier received these goods, to be transported for hire, knowing, at the time, that they were goods subject to duty to the government, and being shipped from one collection district to another, and that, by the law of Congress and the regulations of the revenue department, they could be delivered only into a bonded warehouse, to be reached in compliance only with certain specific regulations. When the carrier received the goods with this knowledge, it impliedly undertook that the goods should be safely delivered at the place of their destination, in the special manner required, and within a reasonable time.

The liabilities of common carriers are for all losses, even inevitable accidents, except they arise from the act of God or the public enemy. And by the act of God is meant some-thing superhuman, or something in opposition to the act of man. In all cases, except of that description, the carriers warrant the safe delivery of the goods. *Hale* v. *The New Jersey Steam Navigation Co.* 15 Conn. 539; 2 Redf. Am. R'wy Cases, 3.

In *Elliott* v. *Rossell*, 10 Johns. R. 1, KENT, Ch. J., said: "It has long been settled that a common carrier warrants the safe delivery of goods in all but the excepted cases of the act of God and public enemies; and there is no distinction between a carrier by land and a carrier by water." And, in his Commentaries, the same learned jurist says: When the responsibility has begun, it continues until there has been a due delivery by him, or he has discharged himself of the custody of the goods in his character of common carrier. There has been, he says, some doubt in the books as to what facts amounted to a delivery, so as to discharge a common carrier. If it be the business of the carrier to deliver goods at the house to which they are directed, he is bound to do so; and give notice to the consignee. The actual delivery to the person is generally conceded to be the duty of the carrier. 2 Kent's Com. 604. This doctrine is fully recognized by this court in *Baldwin* v. *Am. Ex. Co.* 23 Ill. 197.

In *Chicago and Rock I. R. R. Co.* v. *Warren et al.* 16 Ill. 505, this court held that the responsibility of the carrier does not end until that of the owner, consignee or warehouseman begins; that there must be an actual or legal constructive delivery to the owner or consignee, or to a warehouseman, for storage, in order to discharge the carrier from liability as such.

In *Porter* v. *The Same*, 20 Ill. 407, this court, adopting the views of the Supreme Court of Massachusetts, delivered by Chief Justice SHAW, in *Norway Plains Co.* v. *The Boston and Maine R. R. Co.* 1 Gray, 263, held, as to the ordinary business

of railroads as common carriers, that they are responsible as common carriers until the goods are removed from the cars and placed upon the platform; and if, on account of their arrival in the night, or at any other time when, by the usage or course of business, the doors of the merchandise depot or warehouse are closed, or if, from any reason, the consignee is not there to receive them, it is the duty of the company to store them safely, under the charge of competent and careful servants, ready to be delivered, and actually deliver them when called for by the parties entitled to receive them. And for the performance of these duties, after the goods are delivered from the cars, the company is liable as warehouseman or keepers of goods for hire ; that notice to the consignee was not necessary to exonerate the railroad from its liability as common carrier.

In adopting these views, the learned judge who prepared the opinion of the court cites the case of *Moses* v. *The Boston and Maine R. R. Co.* 32 N. H. Rep. 523, as supporting the same doctrine. This was a clear misapprehension, for the court, in the last mentioned case, at the close of a very able opinion presenting the opposite view, refer to the case in Gray, and say: "The ground upon which the decision is based, would seem to be the propriety of establishing a rule of duty for this class of carriers, of a plain, precise and practical character, and of easy application, rather than of adhering to the rigorous principles of the common law. That the rule adopted in that case is of such a character, is not to be doubted; but, with all our respect for the eminent judge by whom the opinion was delivered, and for the learned court whose judgment he pronounced, we can not but think that by it the salutary and approved principles of the common law are sacrificed to considerations of convenience and expediency, in the simplicity and precise and practical character of the rule which it establishes." The rule was expressly repudiated by the Supreme Court of Vermont, in *Blumenthal* v. *Brainard*, 38 Vermt. R. 402, and by Chief Justice Redfield in his work

on the Law of Railways, sec. 130, pl. 6, note 9 and pl. 9.   It was, however, re-affirmed by this court in *Chicago and Alton R. R. Co.* v. *Scott*, 42 Ill. 132, but not without some suggestions against it by Justice Breese, who delivered the opinion of the court.   Since that, it has been fully recognized, and has become the settled law of the court.   *Merchants' Despatch Co.* v. *Hallock*, 64 Ill. 284.

But in Porter's case, above cited, while the court held that removing the goods from the car on their arrival at the place of destination, and, if not called for, they are placed in a suitable warehouse, amounted to a delivery, which terminated the liability of the carrier as such, the court held that conveying the goods to the terminus of the road, or at their destination upon the route of the road, without a delivery of them from the cars, could not amount to such a delivery.   The court said : "The goods are still as completely under the control of the carrier as before, and the owner or consignee would be as effectually precluded from exercising any control over them.   He could do no act for their security or protection while locked up in the car, and none but the carrier and his agents and servants could even know they had arrived. We are strongly inclined to the belief that no decision can be found that such an act releases them from their liability of carriers, and that it should not without something further on their part."

When we go back to the *Norway Plains Company* case, 1st of Gray, it is seen that Chief Justice Shaw formulated the rule in this wise: "The court are of opinion that the duty assumed by the railroad corporation is—and this, being known to owners of goods forwarded, must, in the absence of proof to the contrary, be presumed to be assented to by them, so as to constitute the implied contract between them—that they will carry the goods safely to the place of destination, and there discharge them on the platform, and then and there deliver them to the consignee or party entitled to receive them, if he is there ready to take them forthwith, or if the

292     C. & N. W. R. R. Co. *v.* SAWYER.     [Sept. T.

Opinion of the Court.

consignee is not there ready to take them, then to place them securely and keep them safely a reasonable time, ready to be delivered when called for."

It is very apparent that no such implied contract could arise under the circumstances of the case in hand, nor is one implied that actual delivery would be made to the consignee in person, because these goods were received with the knowledge that they were being shipped in bond, under the provisions of an act of Congress and the regulations of the treasury department in that behalf, and that, therefore, they could not be delivered upon the platform of the railroad, or otherwise, to either the consignee or owner or any general warehouseman; but were required to be delivered into a bonded warehouse, under the superintendence of the collector or some authorized officer in his department. Such a delivery was necessarily subject to the regulations of the law and the revenue department of government.

The contract on the part of the carrier implied by these circumstances was, therefore, to safely carry the goods to the place of their destination, and there safely deliver them into a bonded warehouse or into the custody of the collector of the district there, in compliance with the regulations and course of business of the collector's office in that behalf. This the appellant did not do. There was no delivery of these goods out of the custody of the carrier, under any rule known to the law. Failing to give notice to the consignee, appellant's duty required it to give the written notice at the collector's office required by its regulations and course of business. Failing in this also, and retaining the goods in the cars until they were destroyed by the fire, which was not a loss arising from the act of God or the public enemy, appellant was liable as common carrier.

The judgment of the court below must be affirmed.

*Judgment affirmed.*