## Pennsylvania Company v. Canadian Pacific Ry. Co.

1. COMMON CARRIERS—*Duty When Governmental Power Prevents Carriage of Goods to Their Destination.*—Where the governmental power prevents the carriage of goods to their destination until duties are paid, it is the duty of the carrier to take all practicable means to notify the consignees, and failing in that, to notify the shippers, of the situation. Meanwhile the carrier is at liberty to turn the goods over to the customs officers or to store them in a suitable and reasonably safe place.

2. STATUTE OF LIMITATIONS—*Action Against a Carrier for Neglect in Transporting Goods.*—An action against a carrier for neglect in transporting goods, when not brought upon a written contract, is barred in five years from the date of the tort or breach of duty and not from the time when the damages ensue.

3. ACTIONS—*Against Common Carriers for Neglect in Transporting Goods—Date of Tort or Breach of Duty.*—Defendant company undertook to transport a shipment of oil to a Canadian consignee. The oil was detained by custom officials for the payment of duties. Defendant negligently failed in its duty to use practicable diligence in notifying the consignees and shippers, but caused it to be stored in a defective tank, where it leaked away and was lost. *Held,* that the final breach of duty occurred and the statute of limitations began to run, not when the oil was put into the tank, but when it passed out of the carrier's control by being lost or disposed of.

4. PRACTICE—*Where Evidence May be Excluded and a Verdict Directed Against the Party Holding the Affirmative.*—Where there is no evidence before the jury on a material issue in favor of the party holding the affirmative of that issue on which the jury could, in the eye of the law, reasonably find in his favor, the court may exclude the evidence, or direct the jury to find against the party so holding the affirmative.

5. SAME—*Objection on Ground of Variance Should be Made in Trial Court.*—A variance should be specifically pointed out in the trial court. The objection comes too late when made for the first time on appeal.

Pennsylvania Co. v. C. P. Ry. Co.

Trespass on the Case.—Appeal from the Circuit Court of Cook County; the Hon. CHARLES G. NEELY, Judge presiding. Heard in the Branch Appellate Court at the March term, 1902. Reversed and remanded. Opinion filed March 31, 1903.

Statement.—The facts in this case, so far as we deem it necessary to state them for the present decision, are substantially as follows: May 5, 1882, the Forest City Oil Company of Cleveland, Ohio, shipped fifty-two barrels of carbon oil to one G. G. Fortier, then residing and doing business at Brandon, a place said to contain about a thousand people, in the Province of Manitoba, in Canada, about one hundred and thirty miles west of Winnipeg. The Forest City Oil Company shipped the oil by the Pennsylvania Company at Cleveland and the Pennsylvania Company gave a bill of lading or receipt which set forth that the said oil was to be delivered to " G. G. Fortier, Brandon, Manitoba, care Canada Pacific." The Pennsylvania Company carried the oil to Chicago and there at the Western Avenue transfer delivered it, May 17, 1882, to the Chicago, Milwaukee & St. Paul R. R. Co., receiving a receipt which recited that said goods were marked, " G. G. Fortier, Brandon, Manitoba, care Canada Pacific, care C., M. & St. P." The Chicago, Milwaukee & St. P. Ry. Co. carried the oil to Minnesota transfer, Minnesota, and there handed it over to the St. Paul, Minneapolis & Manitoba Ry. Co., May 24, 1882. Upon May 27th, by the St. Paul, Minneapolis & Manitoba Ry. Co., this oil had arrived at St. Vincent, which was the point of connection between the St. Paul, Minneapolis & Manitoba Ry. and the Canadian Pacific Ry., and at St. Vincent, which is upon the frontier or boundary line of Canada, it was handed over to the Canadian Pacific Ry., and receipted for by that line. At that time the consignee's name, as given in the receipt, was written, " G. G. Foster" and the place of destination, " Brandon." The transfer sheet, which is a part of the receipt, shows, however, that invoices, were sent with the goods, which it is said must have contained the correct name. Billed to " G. G. Foster, care Canadian Pacific R. R., Brandon, Manitoba," the car went

forward to Winnipeg in Manitoba, where it arrived about the latter end of May. It was there unloaded in the yard of the Canadian Pacific Ry. Co.

Meanwhile, a second shipment from the Forest City Oil Company of Cleveland was made on the 31st day of July, 1882, by the Pennsylvania Company, of sixty-four barrels of carbon oil addressed according to the receipt to "Fortier & Burke, Brandon, Manitoba." This oil was carried by the Pennsylvania Company to the Western Avenue transfer of the Chicago, Milwaukee & St. Paul R. R. in Chicago, and there delivered, August 5, 1882, to the Chicago, Milwaukee & St. Paul Ry. Co. It was handed over to the St. Paul, Minneapolis & Manitoba Ry. Co. at Minnesota transfer, August 8, 1882. The way-bills show that at the Minnesota transfer the Chicago, Milwaukee & St. Paul Ry. had changed the billing so as to make it "Fostier & Burpee, Brandon, Manitoba, via C. P. R. R., ac. Forest City Oil Co.," and that the St. Paul, Minneapolis & Manitoba Ry. Co., making a still further change in the billing, marked the consignee and destination upon the way-bill as "Foster & Burpee, Brandon." On August 11, 1882, this car load of oil arrived at St. Vincent and there was receipted for by the Canadian Pacific Ry. Co., as sixty-four barrels of carbon oil for "Foster & Burpee, at Brandon, ac. Forest City Oil Co." This oil arrived at Winnipeg in Manitoba upon the 12th day of August, 1882, or thereabouts. It lay in the car at Winnipeg, according to the testimony, until the 28th day of August, when it was unloaded in the yards of the Canadian Pacific and placed on the ground.

The oil in question was dutiable goods, and when transferred to the appellee company on the boundary line of Canada, the cars were sealed and tagged to indicate that the goods were in bond. When the oil arrived at Winnipeg it was under the control of the customs officials and could not be carried forward until properly entered, cleared and the duties paid. No one, it is said, could do this on behalf of the consignees, except themselves or attorneys, duly authorized by power of attorney. The invoice which

accompanied the oil from St. Vincent was, upon the arrival of the oil at Winnipeg, delivered to the customs officials.   It is said that it was the custom of merchants living west of Winnipeg (Winnipeg being the farthest port of entry west) to have a customs broker duly appointed to represent them, whose duty it was to look after the goods of their patrons upon arrival at Winnipeg and clear the same.   It was not the duty nor custom of the appellee company to pay the duties upon goods.   By sufferance, goods were permitted to remain by the customs officials in the yards of appellee company until cleared, for a period generally of not longer than six months, thus constituting the yards of the company a sufferance warehouse.   The customs duty upon the oil in question was never paid.   The freight charges, amounting to $243.88 on the first car, and $300.16 on the second car, were never paid.   Both cars arrived in Winnipeg in a leaky condition.   There were no addresses upon the barrels in either shipment.   The consignees are said to have been insurance men, unknown in the oil trade, who had never received oil from appellee company at Brandon.   The appellee company sent notices by mail addressed to Foster & Burpee, on the arrival of the goods.   There is evidence tending to show the barrels were unloaded in the railroad yards and were afterward " handed over to a party to have them teamed to a tank at St. Boniface for storing, as the company were unable to find the consignee, and the customs would not allow them to go forward to their destination, this being the furthest point of entry west on the line at that time.   1 was informed it was put in the tank.   It was loaded and sent to the tank."   The second consignment arrived upon the 12th day of August, when it was unloaded and afterward loaded on the teams for the tank at St. Boniface, which was an oil tank owned by the Imperial Oil Company.   A clerk in the custom house testified that he remembered the two consignments of oil in question, after it arrived in Winnipeg.   He says : " The warehousing room was limited then, and a great amount of merchandise was coming in, and all things that could be left out doors was

left there, and amongst other things these two carloads of oil, to which reference is made, were deposited on the ground. They remained there for a length of time exposed to the sun. One car was partially covered with boards to protect it, and on account of the way it had been handled, and the exposure, it was leaking, and I believe that the Canadian Pacific Railway Company made an attempt to have the duty paid. and the oil removed, but for lack of invoices they did not succeed, and to save the oil from total loss they had it stored in a tank on the other side of the river. This was done under the permission of the collector and by direction to me, his subordinate, at the station."

The testimony of Chas. N. Bell, a witness whose testimony was taken on behalf of the Pennsylvania Co., was excluded by the court and its exclusion is one of the errors complained of. Mr. Bell testified that some time preceding December, 1883, but probably a year after the oil was lost, he was the commercial agent of the Chicago, Milwaukee & St. Paul Ry. Co. for Manitoba, and that Wm. Harder was assistant traffic manager of the Canadian Pacific Ry. Co. at Winnipeg, and that he had a conversation at that time with Mr. Harder, under the following circumstances: He, Bell, was representing the freight department of the Chicago, Milwaukee & St. Paul Ry., and Mr. Harder was representing the freight department of the Canadian Pacific Ry. Co. A claim had been made by Fortier & Bucke, of Brandon, for the loss sustained by them for the non-delivery of these cars; and he, Bell, had been instructed by his employing railway to investigate the case. At the time of the conversation his business with Mr. Harder was to endeavor to settle the claim of Fortier & Bucke as between the two roads. In that conversation Mr. Harder told him (Bell) that the first car of the oil had been handed over to the Imperial Oil Company and had been stored in their tank and had leaked and was lost; as to the second car, Mr. Harder reported to him (Bell) that this also had been handed to the Imperial Oil Company, but was sold to them; that the car was sold.

to them at twenty-eight cents a gallon, and that the Canadian Pacific Ry. Co., received for it $552.32, and the value of nine empty barrels, $9, making a total of $561.32.

George G. Fortier and Eustace F. Bucke, having learned of the loss of the oil, brought suit in 1883 or 1884 against the appellant company as the initial carrier, and recovered a judgment in the sum of $2,500, which was paid by appellant, which now seeks to recover in this action against the final carrier.

George Willard and Edward O. Brown, attorneys for appellant; George Packard, of counsel.

Walker & Payne, attorneys for appellee.

Mr. Justice Freeman delivered the opinion of the court.

It appears from the record herein that appellee received the oil in controversy in due course, and that while in its possession, awaiting payment of duty, and with the consent of the Canadian customs authorities, it has disappeared. It is shown that the names of the consignees on the bills of lading had become misspelled and changed apparently by no fault of appellees and that the notices sent by mail to said supposed consignees did not reach the real parties. These parties are shown by the evidence to have made inquiry of the agent of appellee at Brandon, the point of destination, and to have been informed that no merchandise consigned to them had been received. It is said that Brandon, the place of destination, was a small village, where a proper investigation in connection with the inquiries actually made by the consignees might with ordinary care and diligence have discovered who the latter were. However that may be, it does not appear that appellee took any further active means to ascertain the names and address of the parties to whom the oil had been consigned and to whom by their contract of carriage appellee had undertaken to deliver it. So far as appears, no effort was made by writing to the original consignors or to the initial shippers for further information. The oil was merely held

for a time apparently waiting to be discovered by the consignees who were endeavoring to get trace of it. As the consignees did not turn up it was stored in a tank which proved defective and from which it is said to have leaked out. There is also evidence offered tending to show that part of the oil was sold to the Imperial Oil Company in whose tank some, at least, of the oil was stored, and from which it has disappeared.

The appellant herein being the original shipper, has been held liable to the owners because of the non-delivery and loss of the oil. It now seeks to recover from appellee what it has been compelled to pay the owners, and it avers that its said liability was incurred by the negligent failure of appellee to perform its duty as a common carrier and that appellee is liable to it for failure to deliver the oil to the consignees at its destination. C. & N. W. Ry. Co. v. N. L. Packet Co., 70 Ill. 217–222.

The duty of appellee after it had received the oil for transportation was primarily to carry it to its destination, and there deliver it to the consignees. If the latter failed to take the goods or were not found after reasonable efforts on the part of appellee to perform its contract, then appellee was at liberty and it was its duty to "hold the goods for the use of the consignor," or to store them in a reasonably safe place for a reasonable time if not called for. If, as seems to have been the case, the governmental power prevented the carriage of the oil to its destination until the duties were paid, then it was appellee's duty to take all practicable means to notify the consignees, and failing in that, to notify the shippers, of the situation. Meanwhile, appellee was at liberty to turn the oil over to the customs officers, or to store it in a suitable and reasonably safe place. Hutchinson on Carriers, Sec. 335–336–401. Angell on Carriers, Sec. 325; I. C. R. R. Co. v. Frankenberg, 54 Ill. 88–95–96.

The case was taken from the jury at the conclusion of the plaintiff's evidence by an instruction to find the defendant not guilty. This was done apparently on the

ground that the statute of limitations had run when the suit was commenced.

This suit was begun September 3, 1887, five years and one day from the date when it is said the last of the oil passed out of the hands of the appellee by being placed in the tank where it disappeared. It has been held in a branch of this same case (Penn. Co. v. C., M. & St. P. R. R. Co., 144 Ill. 197), that the statute of limitations began to run at the date of the tort or breach of duty and not when the damages ensued. See also, Penn. Co. v. C., M. & St. P. R. Co., 44 Ill. App. 132. The question is, therefore, when did the alleged breach of duty charged in appellant's declaration occur. Did it occur before the oil was placed in the tank, or at the time, or afterward; and if it occurred before or when the oil was tanked, is there any evidence which should have been passed on by a jury tending to show that it may have been so placed later than September 2, 1882. It appears to have been the view of the trial court, that appellee's liability as a common carrier terminated when the oil reached Winnipeg, where it was subject to the orders of the customs officials until the duty should be paid; and also that the alleged cause of action accrued when the oil was placed in the tank, and that the evidence tends to show beyond dispute that this was done prior to September 3, 1882. "If there is no evidence before the jury on a material issue in favor of the party holding the affirmative of that issue on which the jury could in the eye of the law, reasonably find in his favor, the court may exclude the evidence, or direct the jury to find against the party so holding the affirmative." Frazer v. Howe, 106 Ill. 563–573.

There is in this record evidence tending to show that appellee received the goods as a common carrier to deliver at the place of destination, which was Brandon, not Winnipeg. In I. C. R. R. Co. v. Frankenberg, *supra*, it is said (p. 95): "The liability of the carrier commencing with the receipt of the goods, it necessarily continues until they are delivered by him at their place of destination, where

the owner or consignee is bound to be present and receive them, and pay the freight for them if not previously paid. If he be not present to receive the goods, they can be placed in a safe and sufficient warehouse, when the liability of the carrier ceases and that of warehouseman begins." If the oil in controversy had been stored in a "safe and sufficient warehouse" at its destination, which was Brandon, there would be an end of this case. But the first car load arrived at Winnipeg about the end of May or first of June, and the second on the 12th of August, 1882. The consignee was not bound to be present and receive the oil at Winnipeg without notice of its arrival there, which it was appellee's duty to give. These shipments appear from the evidence to have remained respectively in the appellee's yards at Winnipeg a couple of weeks at least before being sent to the tank. If they were tanked September 2d, there was a period of three months from the end of May until September, during which appellee failed to notify the consignees, or so far as appears, to notify the shippers that any of the oil was awaiting payment of duties at Winnipeg. In C. & N. W. R. R. Co. v. Sawyer, 69 Ill. 285–288, it was said : "The carrier received these goods to be transported for hire, knowing at the time that they were goods subject to duty to the government;" and it is further said, "When the carrier received the goods with this knowledge it impliedly undertook that the goods should be safely delivered at the place of their destination in the special manner required, and within a reasonable time." In the case at bar the carrier failed for at least three months before it tanked the oil to either get it to its destination at Brandon, to notify the consignees at Brandon that it was being held at Winnipeg for the duty, or, so far as appears, to notify the initial shipper or consignors, from whom it might reasonably expect to obtain the correct address of the consignees and to receive directions what to do. All that it apparently did was to mail a notice through the post, which by reason of a mistake in the names, seems not to have reached the proper parties. In the case last above

cited it is said: "The liabilities of common carriers are for all losses, even inevitable accidents, except they arise from the act of God or the public enemy. And by the act of God is meant something superhuman, or something in opposition to the act of man. In all cases, except of that description, the carriers warrant the safe delivery of the goods." In the present case there was no superhuman difficulty in appellee ascertaining from the shippers the correct name and address of the consignees, even if this could not have been done by merely notifying its own agent at Brandon, of whom the real consignees were making inquiry. That agent might have discovered that "Foster & Burpee" meant in fact "Fortier & Bucke." There is some evidence also apparently tending to show that the invoices, which it is said contained the correct names of the consignees, as did the initial bills of lading, might have been obtained for examination without much difficulty. A mere change in name on a way-bill or receipt given by a careless clerk while goods are in transit from carrier to carrier has never, so far as we are advised, been held alone sufficient to relieve the last carrier from the obligation to use all reasonable efforts to deliver goods to the real consignees at the proper destination. "The actual delivery to the person is generally conceded to be the duty of the carrier." 2 Kent's Com. 604. In Sjoerds v. Luscombe, 16 East, 201–203, it was said by Lord Ellenborough: "If the freighter undertake what he can not perform he shall answer for it to the person with whom he undertakes." Appellee undertook to deliver the oil to the consignees at Brandon, and if it failed to do so, and if there is evidence tending to show that such failure was caused by its own negligence, and it is shown to have had the oil on hand or under its control within five years before the suit was begun, then the case should not have been taken from the jury. The final breach of duty occurred, not when the oil was put into the tank, but when it passed out of appellee's control by being lost or disposed of, that is, "when the mischief was done." See Backhouse v. Bonomi,

9 House of Lords Cases, 503–511. If it was thus lost through appellee's continuing negligence the final breach of duty occurred and the statute began to run when the loss finally occurred. There is some evidence which it is claimed tends to show that this loss by the alleged leakage occurred after September 3, 1882. This is a question of fact for a jury.

It seems to be assumed in this case that appellee's duty as a carrier ceased and its duty as a warehouseman began when it unloaded the oil at Winnipeg. This position would have been well taken, perhaps, had Winnipeg been its destination, instead of Brandon. It was still under obligation to deliver at Brandon, and its duty as carrier was still unfulfilled.

It is urged that there is a fatal variance between the allegations in the declaration and the proof adduced. The declaration charges delivery by appellant to appellee at Chicago of oil consigned to "G. G. Fortier" and "Fortier & Bucke, Brandon." The proof, it is said, shows the oil delivered to appellee by the St. P., M. & M. Ry. at St. Vincent, billed to "G. G. Foster" and "Foster & Burpee," in which the Minnesota Transfer Company was designated as consignor. Without taking time to discuss the question at length, the alleged variance seems to us, in view of the averments of the declaration, as technical rather than real. It is apparent from the evidence that the original contract of appellant was for through transportation. All subsequent transfers were made and received pursuant to that initial contract. Appellee was acting under the contract made with the first carrier, the appellant. Erie Ry. Co. v. Wilcox, 84 Ill. 239. We think the proof substantially supports the averments of the declaration. We are further of opinion that the point made by appellant is well taken that no specific objection on this ground was made at the trial. If the variance had been specified the declaration could have been amended or further proof supplied. Start v. Moran, 27 Ill. App. 119; St. Clair Co. Benefit Society v. Fietsam, 97 Ill. 476; Richelieu Hotel Co. v. Mil. Encamp. Co., 140 Ill. 259.

We are of opinion that the testimony of the witness Bell, as to the statements made by one Harder, as traffic manager of appellee company, made in the course of negotiations with reference to the claim of the consignees for the loss of this oil, was admissible. The evidence tended to show his authority to act for appellee in the very matter out of which this litigation grows.

We deem it unnecessary, in view of the conclusions stated, to consider in detail other points presented by the counsel. We think it was error to take the case from the jury as was done, and the judgment must be reversed and the cause remanded.