Peelle, Ch. J.,
delivered the opinion of the court:
The question for decision is whether under the contract and specifications made part thereof the claimants were thereby obligated to preserve in good condition without expense to the Government all work then in place; and in respect of the work to be done bidders were advised by paragraph 40 of the specifications that it was imperatively necessary for them to “ visit the locality of the proposed work and obtain, from personal investigation, the information necessary to enable them to make intelligent proposals,” of which personal investigation they were to advise the Government in their letter transmitting their proposals. This was done.
Paragraph 2 of the contract provides that “ the party of the second part shall furnish such labor and material in place, and do such work, and discharge such other obligations connected therewith prescribed in the forementioned specifications, as may be necessary to complete the work of ‘Improving canal at the cascades of the Columbia River, Oregon.’ ”
Paragraph 45 of the specifications provides that “the contract to be entered into will include all excavations and dredging, including the removal of the bulkheads, masonry, filling behind walls, grading and protection of slopes, the placing of irons, the construction of the gates and operating machinery, in short, the entire completion of the lock ready for use, as shown by the drawings and set forth in these specifications.”
Paragraph 149 of the specifications provides:
“ 149. Responsibility for property. — The contractor will be held responsible, without expense to the Government, for the preservation and good condition of all the work now in place, and such as-he may from time to time under this contract put in place, until the termination of the contract, or until the whole work is turned over to the Government in a completed condition, as required. This to include all material of every description on which full or partial payments have been made and all property belonging to the United States in the possession or control of the contractor.”
*137 Paragraph. 152 of the specifications provides:
“152. The contractor’s prices for the various items shall cover all costs of preparation for work, all costs of the materials and appliances in place, all transportation, preservation until termination of contract, and every expense of whatever nature which the United States would otherwise have to pay that may arise during the progress of the work or continuance of this contract, except contingencies for engineering and superintendence by the agents of the United States.”
Such are the material and controlling provisions of the contract and specifications.
The substantial facts found are that in May and June, 1894, while the work was in progress, a heavy flood arose, the water rising'in the river at the rate of an inch per hour until it finally reached from 4 to 6 feet above the highest known level, by reason of which it became necessary to protect the work then in place, which was done by the claimants, as averred, under the authority of the engineer in charge, by constructing a new and higher bulkhead over a line nearly 2,000 feet long and two temporary dams, at a cost to them, exclusive of any profits or of any compensation to them for services, of $37,465.35. Hence this action.
The work on the project, to complete which the contract herein was let and upon which the Government had expended over $1,850,000, was begun in 1878, and was continued under the direct charge of the Chief of Engineers, United States Army, until the advertisement for proposals in 1892, from which resulted the contract with the claimants herein.
The original project, the work of the engineers of the United States Army, was revised by them in 1884 with reference to the records of floods to that date; and protecting bulkheads had been constructed by the Government to an elevation of 142 feet, that being the elevation provided by the plans for the completed work. The project so revised was unchanged at the time the contract herein was awarded.
The defendants’ contention is that by the terms of the contract and specifications the claimants were bound to protect the work then in place, though the flood should exceed *138 the elevation of 142 feet; while the claimants’ contention is that as the project and plans contemplated an elevation of 142 feet at the time their contract was awarded, the work of protecting the bulkheads by increasing the elevation to 148 feet was outside the contract, for which the Government is liable upon an implied contract on quantum meruit.
The defendants base their contention on the paragraphs of the contract and specifications set forth, which obligated the contractor to furnish all the labor and materials necessary “ for the entire completion of the lock ready for use,” in the doing of which the contractor, without expense to the Government, was to “ be held responsible for the preservation and good condition of all the work now in place, and such as he may from time to time under this contract put in place, until the termination of the contract, or until the work is turned over to the Government in a completed condition, as required.”
The act authorizing the continuance of the improvement of the canal of the cascades, as its title indicates, was “ for the construction, repair, and preservation of certain public works on rivers and harbors,” of which the claimants were bound to take notice.
It is apparent from the findings that as the work embraced within the claimants’ contract was for the completion and preservation of the work under the project, they could not have completed the work under their contract without preserving as they did the bulkheads theretofore constructed by the Government for the protection of the work.
The question, therefore, is, Was the work performed within the contemplation of the parties when they entered into the contract? The project, which had long been.matured, coupled with the claimants’ knowledge of the flood levels prior to the date of the contract, would at first seem to exclude the work from the contract. On the other hand, the claimants were bound to take notice of the uncertainty of floods, and if they had desired protection against the same, provision therefor should have been made in the contract; and not having been so made, and the doing of the work necessary “ for the preservation and good condition of all *139 the work now in place ” being authorized by the act and embraced within the terms of the contract, the ordinary rules applicable to voluntary undertakings without qualification must be held to apply. That is to say, as was early held in the case of Dermott v. Jones (2 Wall., 1, 7):
“ It is a well-settled rule of law that if a party by his contract charge himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him.”
In the later case of Chicago, Milwaukee & St. Paul Railway Co. v. Hoyt (149 U. S., 1, 14), the rule was stated thus:
“ There can be no question that a party may by an absolute contract bind himself or itself to perform things which subsequently become impossible, or pay damages for the nonperformance, and such construction is to be put upon an unqualified undertaking, where the event which causes the impossibility might have been anticipated and guarded against in the contract, or where the impossibility arises from the act or default of the promisor.”
In the case of Jacksonville, etc., Railway Co. v. Hooper (160 U. S., 514, 527), and again in the case of United States v. Gleason (175 U. S., 588, 602), the same doctrine was announced; and so this court, in the case of Satterlee v. United States (30 C. Cls., 31, 51), in considering the same subject, said:
“ If the law casts a duty upon a party, the performance will be excused if by the act of God it becomes impossible; but if a party engages to do something and fails to provide against contingencies the nonperformance is not excused by a contingency not foreseen and which by its consequence increases the cost and difficulty of performance. (Chitty, Contr., 272; 7 Mass., 325; 13 Mass., 94; Chicago R. R. Co. v. Sawyer, 69 Ill., 285; Am. Rep., 613).”
It is unnecesary to further cite authorities in suport of a rule so well settled.
The most that can be said in the present case is that by reason of the rise of the water in the river above the elevation of 142 feet the claimants were put to much greater expense in the performance of their contract than they would *140 have been had the flood not occurred. This may be a hardship, but it is one against which the claimants might have guarded by a proper provision in the contract.
The work, though necessitated by the act of God, was not thereby rendered impossible of performance. Hence, the work having been done, it can not 'be held that the flood rendered performance impossible. That the event might have been anticipated and guarded against requires no argument. The project showing the construction of the protecting bulkheads to an elevation of 142 feet can not be construed as a guaranty on the part of the Government that flood waters would not exceed that elevation. The claimant had the same knowledge as to probable floods and their magnitude as the agents of the Government; and treating the flood of 1894 as an inevitable accident or contingency not foreseen would not excuse the claimants from performance if the work done was embraced within their contract. (Beach on the Modern Law of Contracts, sec. 217.)
The claimants, however, contend that the language of paragraph 149 of the specifications, holding them “ responsible, without expense to the Government, for the preservation and good condition of all the work now in place,” is ambiguous, and that as the contract was prepared by the agents of the Government the ambiguities therein should be resolved adversely to the Government; and that if so construed the claimants then would be held responsible for the preservation and good condition of such work only as against their own acts or other human agencies. This latter position is further sought to be maintained on the ground that because, as shown in Finding VI, the engineer in charge, immediately after the flood of 1894, recommended that the project be changed by increasing the elevation of the bulkheads to a height of 148 feet, which was done with the approval of the engineer in charge. This, it is asserted, was a construction by the officer of the Government favoi’able to the claimants’ contention.
With this contention we can not agree. The language standing alone is not susceptible of such limited construction, and certainly not when considered in the light of the act authorizing the continuance and preservation of the *141 work with the other provisions of the contract requiring “ the entire completion of the lock ready for use,” the prices for which, under paragraph 152 of the specifications it was therein provided, were to cover “ every expense of whatever nature which the United States will otherwise have to pay that may arise during the progress of the work or the continuance of this contract, except contingencies for engineering and superintendence by the agents of the United States.” That is to say, the claimants were not to be held responsible for the expenses of engineering and superintendence.
It would be difficult to surmise stronger language for the purpose evidently intended by the act as well as the contract. That is to say, as the Government was discontinuing the work on its own account the purpose in respect of the preservation and good condition of the work in place, as well as the continuance of the work, was to put the claimants in the place of the Government; and to that end it was provided, as before stated, that the claimants’ prices for the work to be done, including the preservation and good condition of the work then in place, should cover “ every expense of whatever nature which the United States will otherwise have to pay * * * except contingencies for engineering and superintendence by the agents of the United States.”
If the work had been continued by the Government, it would have been compelled to increase the elevation of the protecting work, and as the claimants took its place the work fell upon them.
There is a suggestion' that the protecting work was not necessary to the performance of the work under the contract. We think otherwise, and have so found; but whether necessary to enable the claimants to proceed with their work they were certainly bound to protect the “ work now in place,” for which they had agreed to be responsible to the United States. Upon this theory we must presume that the claimants took this into account in making their bid.
The thirteenth paragraph of the contract in terms prohibited the claimants from making any claim whatever against the. United States on account of extra work “unless such extra work * * * shall have been expressly required in writing ” and the prices and quantities were first agreed upon. *142 This was not done, nor did the claimants demand it or protest against doing the work, and hence the acts of the parties in this respect, if the language of the contract were ambiguous, may be considered in determining the force and effect to be given thereto.
The claimants, as before stated, seek recovery on the ground that the work done was not embraced within the contract, but the language “ held responsible without expense to the Government, for the preservation and good condition of the work now in place,” can only be satisfied by holding the claimants responsible for the work done; otherwise the Government, without authority of Congress therefor, would have been compelled to resume tire work of preservation at its own expense contrary to the language holding the claimants responsible therefor.
The exceptions stated in paragraph 152 exclude all others, and when that paragraph is considered with paragraph 149 of the specifications and other provisions of the contract there is no room for doubt; and thus believing, the claimants are not entitled to recover.
' As after the filing of the demurrer herein to the original petition the claimants elected to amend, they thereby confessed that the demurrer was well taken, and the demurrer is therefore overruled, none being filed to the amended petition.
For the reasons stated the petition is dismissed and judgment ordered to be entered in favor of the United States.
Howry, J., took no part in the decision of this case, but reserves his decision, doubting the correctness of the result for reasons set forth in memorandum to be filed hereafter nunc fro tuno as of this day.